Ernestine ATKINS, et al., Plaintiffs,

v.

William A. ROBINSON, et al.,
Defendants.

Civ. A. No. 81-0778-R.

United States District Court,
E. D. Virginia,
Richmond Division.

Aug. 2, 1982.

Ira M. Steingold, Steingold & Glanzer, Norfolk, Va., Stephen W. Bricker, Richmond, Va., Martin E. Sloane, Jane W. Vanneman, Bruce S. Gelber, Staff Atty., National Committee Against Discrimination in Housing, Inc., Washington, D. C., for plaintiff.

Richard K. Bennett, Browder, Russell, Morris & Butcher, Richmond, Va., Russell O. Slayton, Jr., Hammack, Slayton & Bain, Lawrenceville, for all defendants except HUD and Va. Housing Development Authority.

Carl F. Bowmer, Roseleen Rick, Richmond, Va., for Va. Housing Development Authority.

Robert W. Jaspen, Asst. U. S. Atty., Richmond, Va., David Belkowitz, Richmond, Va., Nelson Chan, Philadelphia, Pa., for HUD.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs, low-income black residents of Greensville County, Virginia, bring this class action against the County, the members of the Board of Supervisors ("Board") of the County in their individual and official capacities, and the Board's tie breaker in his individual and official capacity alleging that the defendants' veto of a proposed low-income housing development to be located in the County and to participate in the federal Section 8 Housing Assistance Payments program for rent subsidies for lower income families in new housing units under 42 U.S.C. § 1437f was violative of the Fair Housing Act, Title VIII of the Civil Rights Act of 1964, 42 U.S.C. §§ 3601 et seq., 42 U.S.C. § 1982, the thirteenth amendment, and the equal protection and due process clauses of the fourteenth amendment. Also present as plaintiffs are the two would-be developers of the housing project. The Virginia Housing Development Authority ("VHDA") and the United States Department of Housing and Urban Development ("HUD") were joined as defendants by the Court under Fed.R.Civ.P. Rule 19(a) to assure complete relief should the plaintiffs prevail.

Plaintiffs' statutory causes of action rest on 42 U.S.C. § 3612, 42 U.S.C. § 1981 and 42 U.S.C. § 1982. The Court's jurisdiction

over these claims vests pursuant to 28 U.S.C. §§ 1331 and 1343(3), and 42 U.S.C. § 3612. Their constitutional claims, based on 42 U.S.C. § 1983, are within this Court's jurisdiction under 28 U.S.C. § 1343(3). Plaintiffs on behalf of the two classes they represent [1] seek a court order declaring that Greensville County's veto of the proposed project and the state statute allowing the veto, Va.Code § 36–55.39(B) ("Veto Statute"), to be null and void, prohibiting the County from vetoing the project, assuring Section 8 subsidies and construction financing for the housing complex, permanently enjoining the County from denying access to housing on the basis of race, color, religion, sex or national origin, directing the County to adopt a plan of housing assistance for families in need of rental assistance and to establish a mandatory fair housing educational program for all county officials involved in implementing the court order.[2] The Court having heard the evidence, and argument of counsel, this memorandum as its findings of fact and conclusions of law.

## I. Factual Background

Plaintiffs Maurice Steingold and Simon Miller, developers of lower income housing ("S & M"), entered into a contract in early 1981 to purchase approximately 12 acres of land in Greensville County for $150,000. S&M planned to construct on the property a federally-subsidized, family rental housing project to be known as Emporia Heights.[3] The proposed site is located on Route 58, east of the City of Emporia, Virginia [4] and is situated near water and sewer facilities, municipal and social services, shopping, a hospital and potential employment.[5] S&M applied for a mortgage construction loan from the VHDA envisioning that the residents of Emporia Heights would receive rental assistance payments under the Section 8 Housing Assistance Payments program of Section 8 of the United States

---

**1.** By order dated November 24, 1981, the Court certified the minority plaintiffs as representatives of the two following classes:

 1. All lower income minority persons who reside in the County of Greensville who have been, are presently, and/or will be, on account of race, unable to secure decent, safe, and sanitary housing and who have been, are presently and/or will be applicants for occupancy in rental-assisted housing constructed under federally subsidized housing programs administered and financed by the Virginia Housing Development Authority (VHDA) pursuant to Virginia Code § 36–55.39(B) (1981 supp.) in the County of Greensville, and

 2. All lower income minority persons who reside in the State of Virginia who have been, are presently, and/or will be on account of race, unable to secure decent, safe, and sanitary housing and who have been, are presently and/or will be applicants for rental-assisted housing constructed under federally subsidized housing programs administered and financed by the Virginia Housing Development Authority (VHDA) pursuant to Virginia Code § 36–55.39(B) (1981 supp.).

"Lower income persons" was defined as those persons whose income is below eighty percent of the median income for the standard metropolitan statistical area (SMSA), as defined in the Housing and Community Development Act of 1974, as amended. 42 U.S.C. §§ 5301 et seq.; 24 C.F.R. § 570.3(0).

**2.** Plaintiffs' Trial Memorandum 11–12 ("Ps. Trial Mem."). Plaintiffs' original complaint, in broad brush fashion, included allegations of deprivation of property without just compensation in violation of the due process clause of the fifth amendment, contravention of "provisions of the Housing and Community Development Act of 1974, 42 [U.S.C. §§] 1439, 1440, 1452(b), 2985(b) [sic] and 40 [U.S.C. §] 461," and violation of 42 U.S.C. § 1485. Plaintiffs also sought recovery of $2 million in compensatory and $2 million in punitive damages. In none of their subsequent pleadings did plaintiffs address the Housing and Community Development Act, § 1485, and taking claims, and they declined at trial to adduce any evidence to support those claims. The Court can only conclude that they have been abandoned. Nor have plaintiffs provided the Court with any explication of the theory under which they would be entitled to monetary relief. Nonetheless, the Court will consider whether plaintiffs have established a prima facie entitlement to damages.

**3.** Transcript of Hearing on Plaintiffs' Motion for Preliminary Injunction ("P.Inj.Tr.") 34, 26–29, 36, 149 (October 15, 1981) (admitted into evidence at the trial of this matter).

**4.** Plaintiffs' Proposed Findings of Fact ("Ps. Findings") ¶ 1.2; Plaintiffs Exhibits ("Ps.Ex.") 13 and 14; P.Inj.Tr. 89–90.

**5.** Ps.Findings ¶ 1.2; P.Inj.Tr. 37, 89-90.

Housing Act of 1937, 42 U.S.C. § 1437f.[6] The named individual plaintiffs ("minority plaintiffs") are black residents of Greensville County, currently paying more than 25% of their respective incomes in rent and living in homes without indoor plumbing, who would have eligible for Section 8 assistance in Emporia Heights.[7]

An examination of the financing system for projects similar to Emporia Heights is in order at this point. The VHDA, a political subdivision of the Commonwealth of Virginia, is authorized by Va.Code § 36–55.25 to encourage the investment of private capital in and stimulate the construction and rehabilitation of residential housing through public financing to meet the housing needs of persons of low and moderate income. The agency is empowered to make mortgage loans, insure mortgage loans, borrow money, issue bonds, enter agreements with federal and state governments and administer federal loan programs. Va.Code § 36–55.30. VHDA may pursuant to Va.Code § 36–55.30(10) accept "rent supplement payments made on behalf of eligible persons or families or for the payment in whole or in part of the interest expense for a housing development . . .,"[8] which would include rental assistance payments provided by the federal government under the Section 8 program.

Under the Section 8 program, the Secretary of HUD is authorized to make rental assistance payments with respect to existing ("Section 8 Existing"), newly constructed ("Section 8 New") and substantially rehabilitated ("Section 8 Substantial Rehabilitation") housing "[f]or the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing . . . ." 42 U.S.C. § 1437f(a). Generally, families whose incomes do not exceed 80% of the median income for the area as determined by HUD and who pay between 15% and 25% of their income for rent and utilities are eligible for this rental assistance. 24 C.F.R. §§ 883.-101(c) and § 889.102. Section 8 subsidies are available in connection with financing by the Farmers Home Administration ("FmHA"),[9] or directly from HUD field offices for newly constructed housing,[10] substantially rehabilitated housing,[11] existing or moderately rehabilitated housing,[12] for elderly housing in conjunction with direct HUD loans,[13] and for existing HUD-insured and HUD-held housing.[14] See 24 C.F.R. § 883.101(a)(2). Another line of access to Section 8 assistance, and the one most relevant to this action, is through statewide or special purpose housing agencies, like the VHDA, established by the various states.[15] See 24 C.F.R. § 883.101(a)(1).

The Section 8 program provides only rental assistance, not construction or permanent financing.[16] Rather, it is the responsibility of the agency participating in the program to arrange the financing for newly constructed or substantially rehabilitated housing, and of the owner to finance moderately rehabilitated housing. 24 C.F.R. § 883.101(e). The Section 8 Substantial Rehabilitation program provides certain rent subsidies for eligible families residing in housing improved to "decent, safe and sanitary condition in accordance with [standards set in the agreement among the state agency, HUD and the developer or owner] from a condition below those standards." 24 C.F.R. § 881.201. The Section 8 Existing program provides

---

**6.** Ps.Findings ¶ 1.9; Ps.Ex. 13.

**7.** Ps.Findings ¶¶ 1.17–1.21.

**8.** Memorandum of the VHDA in Opposition to Plaintiffs' Motion for Remedies at 3 ("VHDA Mem.").

**9.** 24 C.F.R. Part 884.

**10.** 24 C.F.R. Part 880.

**11.** 24 C.F.R. Part 881.

**12.** 24 C.F.R. Part 882.

**13.** 24 C.F.R. Part 885.

**14.** 24 C.F.R. Part 886.

**15.** 24 C.F.R. Part 883.

**16.** 24 C.F.R. § 883.101(e); Trial Testimony of Sam Schull, Deputy Director of HUD's Development Housing Division ("Schull Trial Test.")

rental assistance payments for residents of approved existing housing projects or to holders of a Certificate of Family Participation, a family declared eligible to participate in the program by a state or local public housing entity or body, who selects a suitable dwelling unit. 24 C.F.R. §§ 882.-102, 882.103. Housing qualifies as "existing" housing, however, only if it meets the standards of decency, safety and sanitation set by HUD in 24 C.F.R. § 882.109, which require, *inter alia*, hot and cold running water, a flush toilet, certain kitchen facilities, the presence of a living room, kitchen, bathroom and at least one sleeping area for every two persons, lockable doors and windows, safe heating and/or cooling facilities, electricity, adequate illumination, and other structural and material characteristics. 24 C.F.R. §§ 882, 101(a)(2), 882.102, 882.109. Special procedures are provided in 24 C.F.R. Part 882, Subparts D and E for assistance payments to eligible residents of moderately rehabilitated units, *i.e.*, rehabilitation which involves a minimum expenditure of $1,000 for a unit for "modest" improvements needed to comply with the housing quality standards. 24 C.F.R. § 882.402. S & M sought coverage for Emporia Heights under the Section 8 New program, which provides rent subsidies for residents of newly constructed housing units. 24 C.F.R. Part 880.

Under the state agency method of distributing Section 8 New rental subsidies in Virginia, HUD, through the VHDA, enters into an agreement to join a housing assistance payments contract with the private developer of the new housing project. HUD assistance payments, which amount to the difference between the total contract rent for the unit and the rent paid by the tenant, which in turn is determined by a certain portion of his income, are funneled through the VHDA directly to the owner of the project. 24 C.F.R. §§ 101(b); 883.302, 883.602. Each fiscal year,[17] HUD Section 8 New rental assistance funds, in the form of "contract authority," are allocated by HUD Central in Washington, D. C. among HUD, the VHDA and FmHA. HUD Central apportions the authority for rent subsidies to its regional offices, including the Philadelphia Office of Region III, on a "fair share" formula reflecting population, poverty, overcrowding, housing condition and similar indices of housing need.[18] The Region III Philadelphia office in turn suballocates this authority in December or January of each year to the area HUD offices, including the area office in Richmond, Virginia ("HUD-Richmond").[19] HUD-Richmond then develops a plan to allocate this contract authority in various market areas throughout the state of Virginia on essentially the same fair share basis, using Housing Assistance Plans ("HAPS") submitted by various localities and an economist's percentage distribution according to housing needs.[20]

This apportionment rests generally within HUD's discretion, although the VHDA is usually asked whether or not it has a particular project in a certain area which could use the funds. In rural or "non-metro" areas, VHDA normally tries to serve areas, such as Greensville County, which have not previously had a federally-subsidized rental assisted housing project.[21] VHDA receives from HUD a "set-aside" consisting of its contract authority, or its specific expenditures for that fiscal year, and its budget authority, *i.e.*, the extended authority against the contract authority, or the total amount of rental subsidy to be available over the term of the mortgage loan for the project, which is frequently between 25 and

---

**17.** The federal fiscal year runs from October 1 through September 30.

**18.** Stipulations ("Stip.") ¶¶ 1–2; 24 C.F.R. § 883.101(g).

**19.** Stip. ¶ 2, P.Inj.Tr. 203 (Testimony of Sam Schull) ("Schull Test.").

**20.** Stip. ¶¶ 3–4; P.Inj.Tr. 203 (Schull Test.); P.Inj.Tr. 177–78 (Testimony of Larkin Goshorn,

VHDA Director of Multi-family Development) ("Goshorn Test."); 24 C.F.R. §§ 883.101(g), 883.202(a). Greensville County was within one of the market areas for which VHDA was allocated Section 8 authority for the fiscal year 1981. Stip. ¶ 4.

**21.** Stip. ¶ 10; P.Inj.Tr. 178 (Goshorn Test.).

30 years.[22] Notice of the size of its set-aside each year reaches the VHDA informally in November or December, and formally in January.[23] Periodically during the fiscal year, statements of the status of VHDA's contract authority are sent by HUD to the agency on a Form 185.1, which indicates the authority allocated to date along with that which remains.[24]

Once VHDA receives the official notice of its HUD set-aside, it places advertisements in major newspapers throughout Virginia requesting proposals to use the set-aside and specifying a submission period for such proposals.[25] Also considered are projects previously submitted to VHDA by developers but not yet funded which lie "in the pipeline" for funds as they become available.[26] Developers who inquire regarding possible locations of projects are advised of localities yet "unserved" by the Section 8 program.[27] After the end of the submission period, VHDA reviews the project proposals received and already in the pipeline to select those to be funded that fiscal year.[28]

Before the VHDA can finance any housing development undertaken by a housing sponsor,[29] Va.Code § 36–55.39 A requires that it find:

(1) That there exists a shortage of decent, safe and sanitary housing at rentals or prices which persons and families of low income or moderate income can afford within the general housing market area to be served by the proposed housing development.

(2) That private enterprise and investment have been unable, without assistance, to provide the needed decent, safe and sanitary housing at rentals or prices which persons or families of low and moderate income can afford or to provide sufficient mortgage financing for residential housing for occupancy by such persons or families.

(3) That the housing sponsor or sponsors undertaking the proposed housing development in this Commonwealth will supply well-planned, well-designed housing for persons or families of low and moderate income and that such sponsors are financially responsible.

(4) That the housing development, to be assisted pursuant to the provisions of this chapter, will be of public use and will provide a public benefit.

(5) That the housing development will be undertaken within the authority conferred by this chapter upon [VHDA] and the housing sponsor or sponsors.

Trained VHDA personnel review the project proposals in the geographic areas to receive funding and examine the site, the market, the availability of transportation, the project design, the experience of the developer, environmental impact, racial impact, and whether or not the area represents an unserved need.[30] The favored projects then get "approved for further processing," meaning that the initial selection is tentative and examination of the project continues throughout the process.[31]

22. Stip. ¶ 8; Schull Trial Test.; Deposition of R. Carter Sanders, HUD Associate General Deputy Assistant Secretary, at 6 (December 17, 1981) ("Sanders Dep.") (introduced into evidence at trial).

23. P.Inj.Tr. 177 (Schull Test.).

24. Schull Trial Test. See Ps.Exs. 48–70.

25. Stip. ¶ 11; P.Inj.Tr. 178 (Goshorn Test.).

26. Stip. ¶ 12; P.Inj.Tr. 178–79 (Goshorn Test.).

27. Stip. ¶ 13, P.Inj.Tr. 179 (Goshorn Test.).

28. Stip. ¶ 14; P.Inj.Tr. 179–80 (Goshorn Test.).

29. Va.Code § 36–55.26(k) defines "housing sponsor" as an entity approved by VHDA as qualified to "own, construct, acquire, rehabilitate, operate, manage or maintain a housing development ... subject to the regulatory powers of [VHDA] and other terms and conditions set forth in this chapter."

30. Stip. ¶¶ 15–16; P.Inj.Tr. 179–80 (Goshorn Test.); Deposition of John Ritchie, Jr., Executive Director of VHDA, at 38–40 (January 15, 1981) ("Ritchie Dep.") (admitted into evidence at trial).

31. Stip. ¶ 16; P.Inj.Tr. 180–81 (Goshorn Test.); Ritchie Dep. 39–40.

The 1978 amendment to Va.Code § 36–55.39 which sparked the instant controversy requires that VHDA, before it can finance a housing project,

> shall also find, in connection with the financing of the new construction or substantial rehabilitation of any proposed multi-family residential housing development, that the governing body of the locality in which such housing development is to be located has not, within sixty days after written notification of the proposed financing has been sent the governing body by [VHDA], certified to [VHDA] in writing its disapproval of the proposed multi-family residential housing development.

Va.Code § 36–55.39 B. VHDA normally sends the 60-day letter called for by the veto statute to the locality at the time a project is "approved for further processing."[32] After the initial selection of a project, it is presented to the VHDA mortgage loan committee to be accepted formally for processing. At the completion of the underwriting process, it is again reviewed by the mortgage loan committee to be recommended to the VHDA Board of Commissioners for issuance of a mortgage loan commitment.[33] This process usually takes four to six months.[34] VHDA obtains the construction financing in a separate procedure for floating bond issues. The agency's general policy is to go to the bond market with all its set-asides for a single issue for that year's projects, and to attempt to obtain the lowest interest rate possible.[35]

Thus, VHDA selects the projects it desires to fund and, after the preliminary approval for further processing, submits them to HUD as requests for "reservations" of its rental assistance set-aside under the Section 8 New program. The choice belongs to VHDA, for HUD's review of the projects is merely a technical one. See 24 C.F.R. § 883.102(a). Although HUD is charged with the duty to make an independent determination that the proposed project is consistent with the field office allocation plan, the addition of the units will not adversely affect occupancy in existing federally-assisted projects, the state agency meets all equal opportunity requirements in the operation of its programs, and that the project complies with 24 C.F.R. part 891 guidelines on housing need, its review involves no discretionary exercise of judgment or substantive examination, but more closely resembles an audit or technical compliance review.[36] HUD has no authority to make a reservation against VHDA's contract authority in the absence of a proposal submitted to it by the agency.[37] Further, the Court finds that unavailability of HUD rental subsidies in the form of VHDA contract authority effectively aborts a proposed VHDA-financed Section 8 new construction housing project, despite the availability of long-term construction financing through the VHDA.

Two additional means by which contract authority may become available for housing projects not initially selected by VHDA for development deserve mention here. First, the Secretary of HUD has in the past retained in HUD Central 20% of all the funds appropriated by Congress for Section 8 programs in the form of a Central Office Reserve, or, as it is colloquially known, a Secretary's Discretionary Fund.[38] The balance of Section 8 funds is distributed from HUD Central throughout the country through the regular process described above. The Discretionary Fund can be used for various purposes. It may be made available to a

---

**32.** Stip. ¶ 17; P.Inj.Tr. 182 (Goshorn Test.).

**33.** Stip. ¶ 18; P.Inj.Tr. 181 (Goshorn Test.).

**34.** Stip. ¶ 19; P.Inj.Tr. 183 (Goshorn Test.).

**35.** Stip. ¶ 20; P.Inj.Tr. 183 (Goshorn Test.).

**36.** Sanders Dep. 44; Ritchie Dep. 36; Brief on Behalf of HUD in Opposition to Plaintiffs' Motion for Remedies at 2 ("HUD Brief").

**37.** HUD Brief 2; P.Inj.Tr. 205 (Schull Test.).

**38.** Schull Trial Test.; Pr.Inj.Tr. 206 (Schull Test.); Sanders Dep. 14; 24 C.F.R. § 891.-403(b). Apparently, after September 30, 1981, for the 1982 fiscal year, the Secretary is empowered to retain a maximum of 15% of the total appropriation in his Central Office Reserve. Sanders Dep. 17.

state agency, like VHDA, near the end of the fiscal year to provide contract authority for additional projects. Theoretically, a state agency may request the use of the Fund during the year to meet a special need.[39] Issuance of contract authority to VHDA through HUD-Richmond is reflected in a Form 185.1 from the Philadelphia Region III office in the usual fashion.[40] For example, a September 9, 1981 Form 185.1 indicated a $473,000 increase in VHDA's Section 8 New contract authority. As with the majority of allocations from the Discretionary Fund, this authority came earmarked for a particular purpose, the construction of an 88-unit project in Warrenton, Virginia known as Warrenton Manor.[41]

The criteria for selection of projects to be funded from the Discretionary Fund, and the specifics of the procedure for gaining access to the Fund, are somewhat ambiguous. For the period before September 30, 1981, the applicable regulation provided that the reserve was to be used for unforeseeable housing needs, such as those caused by natural disaster or relocation requirements, activities designed to meet lower-income housing needs described in HAPS submitted by local governments, housing in new communities, alternative or innovative methods for meeting housing needs, and to satisfy the needs of community development block grant recipients. 24 C.F.R. § 891.403(b). For fiscal years beginning after September 30, 1981, the possible uses have been narrowed to some degree to include unforeseeable housing needs, the needs of the handicapped or to support minority enterprise, provide for litigation settlements, fund small research and demonstration projects, and to fund HAP needs and innovative plans.[42] At his deposition, R. Carter Sanders, a HUD Associate General Deputy Assistant Secretary, was either unable to or unwilling[43] to detail the exact steps necessary before September 30, 1981 to secure authority from the Discretionary Fund for a proposed development. The net result of Sanders' testimony is that an erstwhile developer can apply directly to an area or regional office of HUD, HUD-Central, or through the state agency for authority from the Fund.[44] According to Sam Schull, Deputy Director for Development in

---

**39.** P.Inj.Tr. 207 (Schull Test.).

**40.** Schull Trial Test.

**41.** Schull Trial Test.; Ps.Ex. 60. Authority set aside through HUD–Richmond for use by the VHDA is referred to on a Form 185.1 as "HFDA–(NON–NSA)." "NSA" designates a special federal program for urban areas, not involved in this action. Schull Trial Test.

**42.** Sanders Dep. 17–18.

**43.** Sanders' recalcitrance as a witness is reflected in the following exchange:

Q How does a developer get that money, Central Reserve Money?
A The developer does not get money.
Q Okay, or get the contract authority for his project?
A I don't understand what you mean, how does he get it?
Q Well, you said that the Central Reserve Appropriations are not included in the NOFA that goes out to the local offices; correct?
A Correct.
Q It's held back in the central office here in Washington?
A That's correct.
Q So that money is not advertised to the developers out in the field?
A That's correct.

Q How does a developer desirous of obtaining contract authority from the Secretary—or from the Central Reserve Funds, get the money?
A He can go into the area office and come within one of these particular categories, and the area office will write a recommendation that possibly a project be funded for this reason.
Q Is that the exclusive means for obtaining the money?
A The money?
A The contract authority?
A The exclusive means—I don't know what you mean.
Q Do you understand the term exclusive?
A Well, you said that the exclusive means for obtaining the contract authority. Do you mean the exclusive means for the developer or for the area office?
Q The developer.
A Yes. Well, yes, in one program.
Q Which program?
A Section 8, which is what you have been talking about.
Sanders Dep. 18–19.

**44.** *Id.* at 20–21.

HUD's Housing Division, HUD personnel are under the assumption that access to the Discretionary Fund is gained through some sort of political or other influence by "pulling strings."[45]

Second, at various unpredictable times throughout the fiscal year, contract and budget authority reserved for a particular project becomes available for reallocation because the project never reaches fruition. Occasionally, an approved project aborts because excess costs or some subsurface soil anomaly renders it unfeasible, the owner decides to abandon the project, or for other possible reasons. The authority originally reserved for such a project is "recaptured" and reverts to the HUD area office.[46] The VHDA may then review the projects in its pipeline to recommend one to HUD for reuse of the recaptured authority, but the final decision on whether the project will receive a reservation rests with HUD.[47] It is even possible that HUD will decide to retain the recapture for use in another year and not to fund a project currently.[48] HUD will not assign recaptured authority to a project disapproved of by a locality under the veto statute, for the project is not viable in the absence of VHDA construction financing.[49] Nor does a vetoed project remain in the VHDA pipeline for any future consideration whatsoever.[50]

On January 15, 1981, VHDA and HUD-Richmond were notified that the contract authority set-aside from VHDA for the fiscal year 1981 amounted to $4,213,000.[51] This subsidy was allocated under the fair share formula between metropolitan and non-metropolitan projects and among the various geographic housing areas into which Virginia is divided by HUD. VHDA calculated the amount of financing necessary to fund housing projects to use fully this contract authority, and began to advertise for sponsors. Approximately 150 applicants responded, of which 30 were for Greensville County.[52] S & M submitted the Emporia Heights application for financing and Section 8 subsidies for 150 units in February, 1981.[53]

VHDA then began its review of the applications to select those most deserving of the limited funds at its disposal. During the process, in March, 1981, VHDA was notified by HUD that because of federal budgetary reductions, the agency was likely to receive only 50% of the set aside originally allocated to it.[54] Nonetheless, on April 21, 1981, VHDA selected "for further processing" eleven proposed projects, funding for which exceeded 50% of original authority, for HUD review and approval.[55] Emporia Heights, scaled down to 74 units, was within this group of eleven.[56] The project was selected because Greensville County represented an unserved need, the site was acceptable, and because of S & M's experience and reputation in the field.[57] Also on April 21, 1981, VHDA sent to Charles Sabo, Chairman of the Board of Supervisors of Greensville County, the 60-day letter called for by Va.Code § 36–55.39 B.[58] The Court finds that in April VHDA forwarded all eleven projects to HUD for review, but

---

**45.** Schull Trial Test.

**46.** Stip. ¶ 26; P.Inj.Tr. 209–10 (Schull Test.).

**47.** P.Inj.Tr. 188–191, 198–99 (Goshorn Test.); P.Inj.Tr. 209–10 (Schull Test.).

**48.** P.Inj.Tr. 199 (Goshorn Test.).

**49.** P.Inj.Tr. 210 (Schull Test.).

**50.** P.Inj.Tr. 191–92 (Goshorn Test.).

**51.** Schull Trial Test.; Ps.Ex. 51.

**52.** VHDA Mem. 5.

**53.** P.Inj.Tr. 30 (Testimony of Simon Miller) ("Miller Test."); Ps.Ex. 13.

**54.** Schull Trial Test.

**55.** Goshorn Trial Test.; VHDA Mem. 5–6. In his preliminary injunction testimony, Goshorn stated that 16 projects were selected for further processing. P.Inj.Tr. 186. At trial, however, he stated that 11 was the correct number, and the Court so finds.

**56.** P.Inj.Tr. 186 (Goshorn Test.); Pr.Inj.Tr. 30 (Miller Test.); Ps.Ex. 44.

**57.** P.Inj.Tr. 186–87 (Goshorn Test.).

**58.** Ps.Ex. 14; P.Inj.Tr. 188 (Goshorn Test.).

listed seven as being of top priority, and four as good but not of such priority. This ranking was based on VHDA's awareness of the level of local political support for the project, which the agency used as a barometer of the likelihood that the project would go forward to completion. If local support was known, either because of approval by the local governing body or from informal indications from that body, VHDA listed the project within the top priority group. Absence of any evidence of local support caused a project to be listed in the non-priority class.[59] Emporia Heights was placed in the non-priority group, despite the lack of any contact between VHDA and Greensville County at the time the list was sent to HUD in April, 1981.[60] The seven prioritized projects eventually received HUD approval and were subsidized out of VHDA's 1981 set-aside. They were the only projects so funded through HUD-Richmond that year. Of these only four were, like the Emporia Heights proposal, family units in a non-metropolitan area.[61]

Then, on May 19, 1981, the Greensville Board of Supervisors met to consider the 60-day letter and the Emporia Heights proposal. A motion to disapprove of the project and to pursue instead Section 8 Existing and Moderate Rehabilitation rental assistance resulted in a tie.[62] A separate motion to pursue the Section 8 Existing and Moderate Rehabilitation program passed unanimously.[63] The Board's tie-breaker, William Robinson, appeared at a June 1, 1981 meeting but concluded that he lacked sufficient information to cast his vote.[64]

Robinson subsequently met with S & M and with a local realtor who supported the Emporia Heights project, and at a June 16, 1981 meeting of the Board voted to disapprove of the project.[65] In a letter dated July 17, 1981, the County's Planning Director, K. David Whittington, communicated the Board's veto of the project to HUD-Richmond.[66]

Meanwhile, VHDA was learning further about the extent of the reductions in the Section 8 New budget for the 1981 fiscal year. In a June 4, 1981 meeting of Larkin Goshorn, the VHDA Director of Multi-Family Development, VHDA Executive Director John Ritchie, and a HUD representative, VHDA was informed that the cutback amounted to 40% of the original set-aside, rather than 50%.[67] As previously noted, the seven priority projects eventually consumed the total contract authority available to the VHDA for the fiscal year 1981, and the agency received no additional set-aside during the remainder of the year.[68] A July 14, 1981 Form 185.1 confirmed the reduction in VHDA's contract authority to $3,147,000.[69] Although the year-end statement of Section 8 funding through HUD-Richmond shows that during the year VHDA was assigned total contract authority of $4,395,000, all the authority above the agency's total set-aside of $3,147,000 came from the Secretary's Discretionary Fund earmarked by HUD for specific projects, and could not be assigned by VHDA to other projects.[70] Thus, even if the County's June 16 veto of the Emporia Heights project had not occurred, the development would never have

59. P.Inj.Tr. 201 (Goshorn Test.); Goshorn Trial Test.; VHDA Mem. 6; Ps.Ex. 80. Goshorn testified at trial that the first seven projects listed on page 3 of Ex. 80 comprised the prioritized class.

60. P.Inj.Tr. 200–01 (Goshorn Test.); Goshorn Trial Test.

61. Goshorn Trial Test.

62. Trial Testimony of Dean BeLer, County Administrator ("BeLer Trial Test."); Defendants' Exhibit ("Ds.Ex.") 8. Supervisors Peggy Wiley and John Woodruff voted to disapprove of the project; Supervisors Garland Faison and Charles Sabo voted against the disapproval.

63. Ds.Ex. 8.

64. BeLer Trial Test.; Trial Testimony of William Robinson ("Robinson Trial Test."); Ds.Ex. 10.

65. Robinson Trial Test.; Ds.Ex. 11.

66. Ps.Ex. 45.

67. Ps.Ex. 80.

68. Goshorn Trial Test.

69. Schull Trial Test.; Ps.Ex. 54.

70. Schull Trial Test.; Ps.Ex. 71.

received Section 8 New contract authority through VHDA out of the agency's set-aside, for there was no contract authority available.[71] The project's fate was sealed once it was not listed as one of the seven prioritized projects presented to HUD by VHDA in its original April selection of projects for reservation of contract authority. This fact becomes important in consideration of the impact of the County's veto. Plaintiffs have shown that certain projects not listed in VHDA's favored seven eventually received Section 8 New authority, but did so through access to the Secretary's Discretionary Fund.[72] Thus, the County's veto was not totally devoid of any effect. The speculative nature of the inquiry into whether Emporia Heights might have received authority out of the Discretionary Fund does, however, weaken plaintiffs' damages claim.

## II. *The Veto Statute as Applied by Greensville County*

The developer plaintiffs, S & M, the minority plaintiffs and the class of lower income minority persons resident in Greensville County raise several challenges to the Board of Supervisors' application of the veto statute by disapproving of the Emporia Heights proposal.

## A. *The Fair Housing Act*

 Plaintiffs contend that the County's veto of the Emporia Heights project contravened the policy and requirements of §§ 804, 808 and 817 of the Fair Housing Act, 42 U.S.C. §§ 3604,[73] 3608,[74] and 3617.[75] They have provided no explanation of the applicable rules under these respective sections of the Act, or of how they differ or interrelate. The Court is of the view that in this action, where the same conduct by the same set of defendants is alleged to violate §§ 3604, 3608 and 3617, the validity of the § 3608 and § 3617 claims depend on whether the defendants' veto of the proposed development ran afoul of § 3604. *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283,

**71.** Schull Trial Test; Goshorn Trial Test.; P.Inj.Tr. 197 (Goshorn Test.).

**72.** Schull Trial Test.; Goshorn Trial Test.

**73.** 42 U.S.C. § 3604 provides:

As made applicable by section 803 [42 U.S.C. § 3603] of this title and except as exempted by sections 803(b) and 807 [42 U.S.C. §§ 3603(b), 3607] of this title, it shall be unlawful—
(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.
(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.
(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, or national origin, or an intention to make any such preference, limitation, or discrimination.
(d) To represent to any person because of race, color, religion, sex, or national origin

that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.
(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex or national origin.

**74.** 42 U.S.C. § 3608 reads, in its only pertinent part:

(d) Functions of Secretary. The Secretary of Housing and Urban Development shall—

(5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this title [42 U.S.C. §§ 3601–3619].

**75.** 42 U.S.C. § 3617 states:

It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 803, 804, 805, or 806 [42 U.S.C. §§ 3603, 3604, 3605, or 3606]. This section may be enforced by appropriate civil action.

1288 n.5 (7th Cir. 1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978) ("*Arlington Heights II*") (§ 3617). *See United States v. City of Black Jack, Missouri*, 508 F.2d 1179 (8th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975) (§ 3617); *United States v. American Institute of Real Estate Appraisers*, 442 F.Supp. 1072 (N.D.Ill.1977), *appeal dismissed*, 590 F.2d 242 (7th Cir. 1978) (§ 3617). Plaintiffs have failed to articulate any theory under which the duty imposed on HUD by § 3608, and possibly also upon local housing authorities,[76] falls as well upon the County of Greensville and its Board of Supervisors. Since the Court is unable to conceive of any rationale for applying § 3608 to the County, the § 3608 count against it will be given no further consideration.

■ The Congressional purpose in enacting the Fair Housing Act was "to provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. Although proof of a discriminatory intent is a prerequisite to a finding of a violation of the equal protection clause of the fourteenth amendment, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) ("*Arlington Heights I*"), a breach of § 3604 can be established, under certain circumstances, by a showing of discriminatory effect without proof of a discriminatory motive. *Smith v. Town of Clarkton, North Carolina*, 682 F.2d 1055 (4th Cir. 1982); *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2nd Cir. 1979); *Arlington Heights, II, supra; United States v. Mitchell*, 580 F.2d 789 (5th Cir. 1978); *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (3rd Cir. 1977),

*cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978); *Smith v. Anchor Building Corp.*, 536 F.2d 231 (8th Cir. 1976); *United States v. City of Black Jack, Missouri, supra.*

The plaintiffs in *Arlington Heights II*,[77] a would-be developer and several prospective tenants of a low and moderate income housing project planned for the Village of Arlington Heights, sought to compel the town to rezone the proposed site to permit construction of the multi-family project. The court ruled that the Village's refusal to rezone the property had a disproportionately adverse impact upon the area's black residents, because a greater number of black people than white in the area satisfied the income requirements for federally-subsidized housing, and because the Village's population was almost totally white and the preclusion of the housing project prevented achieving the racially integrative effect of locating the development in that area. The Court refused, however, to conclude that every action which produces some discriminatory effect is thereby illegal under the Fair Housing Act. Ruling that courts are instead to use their discretion in deciding whether relief is warranted under the particular circumstances of each case, the court used four critical factors to determine whether a violation of the Act has occurred:

(1) how strong is the plaintiff's showing of discriminatory effect;

(2) is there some evidence of discriminatory intent, though possibly not enough to satisfy the constitutional standard of *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976);

(3) what is the defendant's interest in taking the action complained of, and

---

**76.** *See Acevedo v. Nassau County*, 500 F.2d 1078, 1082 (2nd Cir. 1974) (affirmative duty of § 3608(d)(5) to promote integration imposed on HUD alone); *Otero v. New York City Housing Authority*, 484 F.2d 1122, 1133–34 (2nd Cir. 1973) (§ 3608(d)(5) duty falls on HUD and on other agencies administering federally-assisted housing programs). *See also Resident Advisory Board v. Rizzo*, 564 F.2d 126, 140 n.18 (3rd Cir. 1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978).

**77.** *Arlington Heights II* was the opinion of the Court of Appeals for the Seventh Circuit after remand from the Supreme Court in *Arlington Heights I*, where the Court reversed the court of appeals' ruling that discriminatory impact alone was sufficient to establish a constitutional violation.

(4) does the plaintiff seek to compel the defendant affirmatively to provide housing for members of minority groups or merely to restrain the defendant from interfering with individual property owners who wish to provide such housing. 558 F.2d at 1290. The Court of Appeals for the Fourth Circuit adopted this exact analysis in *Smith v. Town of Clarkton, North Carolina, supra*, where a black resident of Bladen County, in which Clarkton was located, contended that Clarkton's withdrawal from a multi-municipality housing authority formed with two neighboring towns, which effectively blocked the construction of a federally-subsidized low-income housing project in the county, was racially motivated in violation of the fourteenth amendment and produced racially disparate effects unlawful under the Fair Housing Act.[78]

▇ Plaintiffs have succeeded in this action in showing that the County's veto of the Emporia Heights project generated a racially discriminatory impact. The court in *Arlington Heights II* identified two types of discriminatory effects which can be produced by a facially neutral housing decision. First, the decision may have a greater adverse impact on one racial group than on another. Second, the decision may have a pejorative effect on the community involved by perpetuating existing patterns of segregation and preventing interracial association. 558 F.2d at 1290.

The first type of impact is established largely through the use of population, income and housing statistics for the affected area. The Village's refusal to rezone in *Arlington Heights II* had a disproportionately adverse impact on blacks than on whites because a greater number of blacks than whites satisfied the income requirements for federally subsidized housing. In *Smith v. Town of Clarkton, supra*, the Court of Appeals for the Fourth Circuit reached a similar conclusion, using somewhat different statistics. It noted that 56% of all poverty level families in the county were black, 69.2% of all black families in the county were eligible for low income housing while only 26% of the white population was so qualified, 60% of the substandard housing in the county was black-occupied, and the per capita income of blacks averaged $1,722, compared to $3,206 countywide, all of which showed that the black population was most in need of new construction to replace substandard housing.

▇ It is undisputed that there is an overwhelming need for improved housing in Greensville County, which has the lowest per capita income of any county in the state.[79] Further, the Court finds that the existence of substandard housing, and therefore the need for newly constructed or otherwise improved housing, is concentrated disproportionately among the blacks of the County. The County was 57.3% black in 1970 and 56.6% black in 1980.[80] The 1979

**78.** Several courts have followed the rule that proof of a racially discriminatory intent is not necessary to establish a violation of the Fair Housing Act, but approach the issue with a perspective seemingly different from that of the *Arlington Heights II* court. These courts allow that a showing of discriminatory impact is sufficient to establish a *prima facie* violation of the Act, and then shift the burden to the defendant to come forward with evidence to justify its actions. *Robinson v. 12 Lofts Realty, Inc., supra; Resident Advisory Board v. Rizzo, supra; United States v. City of Black Jack, supra.* They also differ as to what the defendant must show in the way of justification. *Compare City of Black Jack, supra* (defendant must show that its conduct was necessary to promote a compelling governmental interest), with *Rizzo supra* (justification must serve a legitimate, bona fide interest of the defendant, and the defend-

ant must show that no alternative means existed to serve that interest with less discriminatory impact). To the extent that the approaches used by these courts differ from the *Arlington Heights II* inquiry, the Court will follow the lead of the Court of Appeals for the Fourth Circuit in *Smith v. Town of Clarkton* and closely adhere to the latter.

**79.** Ps.Exs. 19–21; 31–32. *See* P.Inj.Tr. 52.

**80.** Ps.Ex. 30, P.Inj.Tr. 72–76 (Testimony of Yale Rabin) ("Rabin Test."). Dr. Rabin, Associate Professor of Urban and Environmental Planning and Associate Dean of the School of Architecture at the University of Virginia, served as plaintiffs' planning expert in this action. His testimony, based on a review of 1970 and 1980 census data, and other documents indicat-

median income for all families in the County was $5,883, while the median black family income was $4,302 or 73% of the county-wide median.[81] In 1979, per capita income in the County was $1,546, but for blacks it was only $994, or 64.3% of the level for the general population.[82] Also, 29.6% of all Greensville County families were below the poverty level in 1969, but 49.1% of black families were so situated. Thus, 78.8% of all families below the poverty level were black.[83] The HAP prepared by the County in connection with its Community Development Block Grant ("CDBG") application in 1980 reveals that 83.9% of the 1019 low-income families designated as needy of housing assistance were black and 94.4% of the 535 renter households needing housing assistance were black.[84] Plaintiffs demonstrated that 72.6% of all black-occupied housing units in the County lack some or all plumbing facilities[85] and 62.7% of the black units lacked running water entirely.[86] Moreover, of all the units in the County which lack some or all plumbing facilities, 83.8% are black-occupied, while only 16.2% are occupied by whites.[87] Of all the housing units in the County which are overcrowded, i.e., containing more than 1.1 persons per room, 80% of them are black-occupied.[88] Northwoods Village Apartments, a Section 8 New project located in the City of Emporia, has over 400 households on the waiting list. Of these, all but eight are black.[89] This picture of the housing and income characteristics of the County's population reveal that the County's black residents are those most in need of improved,

low-income housing and thus are disproportionately adversely affected by any decision by the County which hampers the development of such housing. The County's assertion that there is "no showing in the record . . . that [the veto affects] low-income minorities to any greater extent than low-income whites"[90] is patently erroneous.

The Court also finds that white and black households in the County are grouped along racial lines, and continue to reflect the segregated patterns enforced by the County by law in earlier years.[91] The closest populated area to the proposed Emporia Heights site is a predominantly white residential area of the City of Emporia.[92] Locating the development on that site would have achieved this beneficial integrative effect.

█ It is appropriate at this juncture to address the County's argument that the Board's veto of the Emporia Heights proposal was a mere act of futility, totally devoid of any impact, discriminatory or otherwise, because by the time of the June 16 veto all of the VHDA set-aside from HUD for the 1981 fiscal year had been allocated to seven other projects. From this, the County maintains that Emporia Heights would never have been funded even without the veto, since no further authority was forthcoming from HUD and the project could not be developed in the absence of Section 8 rental subsidies. The Court has found that by June 4, 1981, VHDA had learned of the reductions in its set-aside and of its inability to fund all the projects in the

ing state and county population and income characteristics, supported Ps.Exs. 30–34.

81. Ps.Ex. 31; P.Inj.Tr. 75 (Rabin Test.).

82. Ps.Ex. 31; P.Inj.Tr. 75 (Rabin Test.).

83. Ps.Ex. 32; P.Inj.Tr. 76–77 (Rabin Test.). This compares to the 56% of poverty-level families who were black in Smith v. Town of Clarkton.

84. Ps.Ex. 32; P.Inj.Tr. 77–78 (Rabin Test.).

85. Ps.Ex. 33; P.Inj.Tr. 79 (Rabin Test.).

86. P.Inj.Tr. 82 (Rabin Test.).

87. Ps.Ex. 33–34; P.Inj.Tr. 79 (Rabin Test.).

88. Ps.Ex. 33; P.Inj.Tr. 83 (Rabin Test.).

89. P.Inj.Tr. 44–45 (Testimony of Willie Earl House, Manager of Northwoods Village Apartments).

90. Greensville County's Memorandum in Support of Proposed Conclusions of Law at 2.

91. P.Inj.Tr. 134–35 (Testimony of Garland P. Faison) ("Faison Test."); P.Inj.Tr. 146–47 (Testimony of William Chamblis, chairman of an Emporia bank) ("Chamblis Test.").

92. P.Inj.Tr. 90 (Rabin Test.).

state it had originally proved. It is correct that by the time of the Board's veto, which would preclude VHDA from providing the construction financing for Emporia Heights, the project had been effectively aborted by rescission in HUD's 1981 budget. Thus, the Board's disapproval did not have the obvious direct effect of precluding a viable low-income housing development which, but for the veto, would have been built. Nonetheless, the Court is convinced that the veto had an impact. Its impact was primarily prospective, in that it placed an immovable obstacle in the way of VHDA construction financing for Emporia Heights. VHDA officials were optimistic that despite the HUD reductions, additional authority might be available from the Secretary's Discretionary Fund, and developers with projects pending were urged to "call their congressman . . ." to seek funds from the "Secretary's Discretionary pot."[93] The would-be developers of Emporia Heights were precluded from attempting to tap that source of funds by VHDA's inability to participate further. Also, the veto removed the Emporia Heights proposal from VHDA's pipeline, which made it ineligible to receive any recaptured authority which might have arisen during the remainder of 1981 or might surface at any time in the future. Absence from the pipeline also means that the project will not be considered in future fiscal years for reservation from the VHDA's yearly set-aside. Clearly, however, the possibility that funding could have been arranged from the Discretionary fund, or that recapture or reservation will be available in the future, is all highly speculative. This may weaken the force of the effect of the veto under the first of the four *Arlington Heights II* critical factors. Nonetheless, the Court holds that the veto had some impact, and that that impact was discriminatory in nature. Thus, the Court must proceed to analyze the four critical factors to determine whether a violation of the Fair Housing Act indeed occurred.

93. Ps.Ex. 80; Goshorn Trial Test.

1. *Type of Impact:*

As the Court has noted, the adverse impact of the Board's veto fell more heavily on the black population of Greensville County, for it is the group most in need of new construction to replace substandard housing, and it has the highest percentage of presumptively eligible applicants. *See Smith v. Town of Clarkton, supra.* The *Arlington Heights II* court concluded that this sort of discriminatory effect was weakened, in that case, because while the Village's refusal to rezone had an adverse impact on a greater percentage of the nonwhite people in the Chicago area than of the white people in the area, it was also true that the class harmed by the decision was not predominantly nonwhite, as 60% of those people in the area eligible for federal housing subsidization were white. The court contrasted those statistics with the situation in *Rizzo, supra,* where 95% of the persons on the waiting list in the subject area were members of minority groups. 558 F.2d at 1291. The circumstances of the instant action resemble more closely those of *Rizzo* than of *Arlington Heights II.* Blacks reside in 83.8% of the units in the County lacking some or all plumbing facilities. Of those families designated by the County as needy of housing assistance, 83.9% are black, while 94.4% of the renter households needing assistance are black. Thus the class injured by the Board's veto was predominantly black. This aspect of the impact factor favors the plaintiffs, but it must be remembered that the effect of the veto is weakened somewhat by the speculative nature of whether the project would have ever received HUD funding without the veto.

The Court has also found that the construction of Emporia Heights would have had a racially integrative effect. In *Arlington Heights II,* the court was unable to assess the weight to be given this aspect of the impact analysis, for the record was unclear on whether there were other sites within the Village on which the town had no objection to the construction of low-cost

housing projects. 558 F.2d at 1291. Emporia Heights would not have been located in an overwhelmingly white area, for nearby to the northwest is a predominantly black residential part of the City of Emporia.[94] It does appear, however, that the chances of development of any such project at any location in the County are very dim. The Board blocked construction of other proposed low-income, federally-funded or federally-subsidized housing projects in January, 1971,[95] December, 1971,[96] and March, 1981.[97] At its December 9, 1971 meeting, the Board passed a resolution that it "go on record as opposing this type housing."[98] When it disapproved of the Emporia Heights proposal, the Board voted to pursue instead the Section 8 Existing and Moderate Rehabilitation programs, and has defended the veto in this cause by pointing to this policy. These Section 8 programs, however, would tend to reinforce existing patterns of racial segregation, for the only units in the County suitable for participation in the program are in the Washington Park community, which is entirely black.[99] The Court concludes that the Board's veto did tend to perpetuate segregated housing in the County, but again this effect is weakened by the doubt regarding the availability of HUD funding absent the veto. On the whole, however, the impact factor tips in favor of the plaintiffs.

2. *Racial Intent:*

*Arlington Heights II* labeled the presence of some evidence of racial intent factor the least important of the four to be considered. 558 F.2d at 1292. Proof of racial bias is extremely difficult, for "[a]s overly bigoted behavior has become more

94. P.Inj.Tr. 90 (Rabin Test.).

95. Ps.Exs. 38–40.

96. Ps.Ex. 41.

97. Ps.Exs. 8–9.

98. Ps.Ex. 41.

99. Trial Testimony of Yale Rabin ("Rabin Trial Test.").

100. It could be argued that a court faced with Fair Housing Act and fourteenth amendment

unfashionable, evidence of intent has become harder to find." *Arlington Heights II, supra,* 558 F.2d at 1290. Moreover, efforts to discern the intent of an entity such as a county or municipality are inherently problematic. *Id.* "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights I, supra,* 429 U.S. at 266, 97 S.Ct. at 563. Fair Housing Act plaintiffs do not have to establish that race was the sole, or the primary, motivation for the action complained of. Nor is such a high level of proof even required to make out a constitutional violation, which can be found if "a discriminatory purpose has been a motivating factor in the decision," or was a "competing consideration . . ." in the process which led to the decision. *Arlington Heights I, supra,* 429 U.S. at 265–66, 97 S.Ct. at 563. *See Smith v. Town of Clarkton, supra; United States v. City of Parma, Ohio,* 661 F.2d 562, 575 (6th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982); *United States v. Mitchell, supra,* 580 F.2d at 791. Plaintiffs have produced no direct evidence of a racial animus behind the Board's veto. Thus, the Court must analyze the circumstantial evidence surrounding the Board's vote to determine if a racially discriminatory intent may be inferred. The Court will proceed also to assess the evidence at this point to ascertain whether it rises to the level of a constitutional violation, and if not, whether there is sufficient suggestion of some racial motive to cause this factor to favor the plaintiffs under the *Arlington Heights II* Fair Housing Act analysis.[100]

claims should first conduct the *Arlington Heights I* analysis to determine whether the defendant's actions were motivated by a racially discriminatory purpose. If yes, the finding of discriminatory intent would be sufficient to establish violations both of the equal protection clause, assuming the absence of any countervailing compelling governmental interest, and of the Fair Housing Act. If not, the Court could then conduct the *Arlington Heights II* analysis to ascertain whether relief under the Fair Housing Act is warranted, despite the absence of discriminatory intent. By hypothesis,

In *Arlington Heights I*, the Court identified six factors to be considered in an effort to glean a discriminatory purpose from a defendant's conduct:

(1) the discriminatory impact of the official action;

(2) the historical background of the decision;

(3) the "specific sequence of events leading up to the challenged decision;"

(4) departures from the "normal procedural sequence . . . ;"

(5) departures from normal substantive criteria; and

(6) the legislative or administrative history of the decision.

429 U.S. at 266–68, 97 S.Ct. at 563–565. *See Resident Advisory Board v. Rizzo, supra,* 564 F.2d at 143.

The Court has previously determined that the black residents of the County will disproportionately suffer from the Board's veto and the impact of the decision falls more heavily on them than on the white population in the County. *See Smith v. Town of Clarkton, supra.*

The *Arlington Heights I* Court noted that the historical background of a decision is particularly relevant "if it reveals a series of official actions taken for invidious purposes." 429 U.S. at 267, 97 S.Ct. at 564. As noted earlier, since 1970, the County has blocked three other proposed low income housing projects in the County.[101] In 1971, the Board went on record as "opposing this type housing."[102] At a March 17, 1981 meeting of the Board, Supervisor Woodruff, who voted against the Emporia Heights proposal, stated his opposition to low-income housing as follows:

Mr. Chairman, in the past I thought the Board in the past has been against low-income housing. I personally am against low-income housing. I look at it as being in some cases an asset to begin with, but then in some . . . many cases a real liability in a few years to come and I just, I don't, I have a problem with giving people something for nothing and I don't think you make them better citizens. I think . . . , but I think everybody ought to know what it is to pay and if not then they have to take some of the other things for less. I mean there's no point, I know some cases where people living in apartments and buildings better than they ever , lived in their life, better than their forefathers lived in, yet don't do anything. I know a lot of country homes out here, some of them tenant houses that were or either country homes that you've seen go down to nothing. Yet, people could have lived in these houses. I just have a real problem with low-income housing and what's been the record over the years in other areas where they were built. I read an article just recently on that and they were saying that where somebody was being sued because they didn't want to get into that type thing and by that they were discriminating and yet they, these type people would tear the project all to pieces. They didn't want to rent to them. So that's where I have some problems at.

. . . . . .

I've read too many things and places where the people were put in there and given these things, pay nothing, end up stealing the plumbing out of them and everything else, you know, I just. In

this latter analysis applies in situations in which the evidence of intent is insufficient to serve as a basis for relief. *Arlington Heights II, supra,* 558 F.2d at 1292. Nonetheless, the Court of Appeals for the Fourth Circuit in *Smith v. Town of Clarkton, supra,* first addressed the Fair Housing Act question despite the lower court's finding that racially discriminatory motives played a role in defendants' actions to block the construction of public housing in Clarkton. The Court ultimately concluded that the defendants' conduct ran afoul

of the Fair Housing Act and of the fourteenth amendment. However a court proceeds, some overlap between the two analyses is inevitable, for the *Arlington Heights I* constitutional test requires examination of the discriminatory impact of the defendant's actions, which is a crucial part of the *Arlington Heights II* Fair Housing Act inquiry.

**101.** Ps.Exs. 37–41.

**102.** Ps.Ex. 41.

other words, they were an asset but became a liability.[103]

Although there is no direct evidence of a racial basis for Woodruff's position on low-income housing, the Court is of the view that against the background of the overwhelming need for such housing in the County and the County's stated policy, these statements may be interpreted as "camouflaged" racial expressions. *See Smith v. Town of Clarkton, supra.* Also, despite the County's recognition of the need for improved housing within the borders, its statement in its May, 1980 HAP submitted to HUD in its CDBG application that it would "actively seek available federal, State and local funding to facilitate the provision of assisted housing in rural areas and keep low and moderate-income persons informed of available assistance,"[104] and the July 14, 1980 offer by Steven Player, who administers such programs in a comparable rural county in North Carolina, to assist Greensville in developing similar assistance programs, the County currently has no rental subsidy programs.[105] Although the Court is unable on the present record to conclude that the County has taken a "series of official actions ... for invidious purposes," it does appear that the County policy rests on a deep-seated opposition to rental assistance programs, and that at least some racial overtones cloud the County's experience with low-income housing proposals.

The specific sequence of events which led up to the Board's veto of the Emporia Heights development has been outlined by the Court. In *Arlington Heights I,* the Supreme Court hypothesized that a locality's sudden change in the zoning classification of a tract of property from multi-family residential to one which would preclude construction of a low-income project upon learning of plans to erect such housing would provide strong evidence of racial motive. 429 U.S. at 267, 97 S.Ct. at 564. The instant plaintiffs have failed to suggest any peculiarities in the chronology of the Board's actions relative to Emporia Heights, standing alone, which cast suspicion on its motives.

Nor were there any deviations by the Board from its normal procedures for considering low-income housing proposals. The court in *Smith v. Town of Clarkton, supra,* found significant an "opinion poll" conducted by town officials for the first time in Clarkton's history immediately after expressions of racial opposition to the building of public housing units had surfaced within the community. Also important were Clarkton's sequential withdrawal from participation in the housing project and recommended discharge of housing authority personnel based solely on the negative results of the poll. No analogous procedural irregularities occurred in this action. The Board considered the Emporia Heights proposal in its usual fashion, called in the tie-breaker, and voted on the matter according to its ordinary rules of business. Plaintiffs claim that the veto statute itself represents a departure from procedural norms, since it fails to specify standards to govern the locality's decision and only low-income housing financed through VHDA faces the possibility of veto.[106] This argument, however, sheds little light on the Board's purpose in vetoing the proposed development.

The *Arlington Heights I* Court indicated that substantive departures are particularly relevant if the "factors usually considered important by the decisionmaker strongly fa-

---

**103.** Ps.Ex. 9.

**104.** Ds.Ex. 1.

**105.** Trial Testimony of Dean BeLer, County Administrator ("BeLer Testimony"); P.Inj.Tr. 103–107 (Testimony of Barbara Holloway, Assistant to the County Administrator for the past three years, and Housing Coordinator for the County) ("Holloway Test."). Ms. Holloway essentially testified that the County has yet to assist a tenant in locating rental assistance, that she was unfamiliar with the paperwork necessary to process any of the rental subsidy programs available through VHDA, HUD or FmHA, and was unaware of any effort by any County official to assemble aids to developers, owners or tenants trying to secure rental subsidies.

**106.** Ps.Findings 3.11–3.14.

vor a decision contrary to the one reached." 429 U.S. at 267, 97 S.Ct. at 564. Application of this factor to the case at bar is a bit problematical, for the County has generated outward appearances of having two conflicting policies. On the one hand, the Board went on record in 1971 as "opposing this type housing" when it disapproved of a proposed low-income housing development.[107] On the other, the County's 1979 Comprehensive Plan,[108] its 1980 CDGB application,[109] and an April 29, 1980 letter from Dean BeLer, County Administrator, to HUD [110] evidence a professed desire on the part of the County to implement a fair housing strategy and provide low-income housing for its residents. Recognizing the substandard quality of much of the housing in the County [111] and that it had not taken advantage of federal housing programs,[112] the County set as its goals in the 1979 Comprehensive Plan that the "County should respond to the problems of substandard shelter ..." and should "[e]ncourage the construction of multi-family housing units ...."[113] The Plan also designated an area around the City of Emporia, which includes the Emporia Heights site, as a "growth area" which is "desirable for higher density multi-family developments ...."[114] In the HAP submitted by the County with its successful application with HUD in March, 1980 for a $575,000 CDBG grant under the Housing and Community Development Act of 1974, 42 U.S.C. §§ 5301 *et seq.*, the County professed its intention "actively [to] seek available federal, State and local funding to facilitate the provision of assisted housing in rural areas ...."[115] In the April 29, 1980 letter, the County boasted of its assistance to "private developers with proposals for assisted family housing outside of minority-concentrated areas." [116]

It appears that the County may have been drifting away from the absolute opposition to low-income housing it adopted in 1971. At any rate, to the extent that the County's statements in these documents carried any meaning whatsoever, the veto of the Emporia Heights project deviated from the substantive criteria they provided.

Lastly, the Court considers the administrative history of the Board's veto. In *Arlington Heights I*, the Court noted that contemporary statements by members of the decisionmaking body, minutes of its meetings, or other indicators of the thought processes of the decisionmakers are especially relevant. 429 U.S. at 268, 97 S.Ct. at 565.

By the time of the Board's vote on Emporia Heights, its members were certainly aware of the substandard level of much of the housing in the County. Supervisors Faison, who is black, and Sabo, who is white, voted in favor of the project at the May 19, 1981 meeting of the Board. Supervisors Woodruff and Wiley, both of whom are white, voted against it.[117] The tiebreaker, William Robinson, who is white, also voted to disapprove of the project at the June 16 meeting.[118]

The minutes of the May 19, 1981 meeting reveal nothing of the Board's deliberations. Faison testified that race was not mentioned at all during the meetings on the subject, but that it was his impression that the Board had a policy opposing low-income developments.[119] County Administrator BeLer stated at trial that the Board did not discuss the racial aspects of the Emporia

107. Ps.Ex. 41.

108. Ps.Ex. 2.

109. Ps.Exs. 4, 5 and 6; Ds.Ex. 1.

110. Ps.Ex. 7.

111. Ps.Ex. 2 at 19.

112. *Id.* at 22.

113. *Id.* at 40.

114. *Id.* at 51.

115. Ps.Ex. 4 at § 5; Ds.Ex. 1.

116. Ps.Ex. 7.

117. Ds.Ex. 8.

118. Ds.Ex. 11.

119. P.Inj.Tr. 141–42 (Faison Test.).

Heights Proposal,[120] and the Court so finds. The Court further finds, however, that Woodruff and Wiley made statements contemporaneous with the veto which may be interpreted as veiled references to race. In an interview with a newspaper reporter for a story which appeared in a July 2, 1981 edition of a local paper, Woodruff indicated that he opposed subsidized housing because he felt that "giving people something for nothing" destroys their initiative to work and better themselves. Of those then in substandard housing in the County Woodruff said, "most of them could be living in better homes if they wanted to. With the handicapped and elderly it's a different story." Except for "some hardship cases," he continued, most people "who really try" can work and afford to build a decent home. "You just don't make better citizens out of people when you give them something for nothing." [121] A July 9 article by the same reporter indicated that Woodruff denied there was any racial motivation behind the Board's veto.[122] Also, to the same reporter, Wiley stated that she was "not in favor of housing projects *per se* ... It's been proven that crime is on the rampage in housing projects." [123] The July 9 article related that Wiley said she feared the projects "would degenerate to slum-like conditions, with an abundance of crime." [124] Based on review of these exhibits, and the testimony of the author of the articles, John Sizemore,[125] the Court finds them to be an accurate recordation of the supervisors' statements.

In *Smith v. Town of Clarkton, supra,* the court found hidden racial meaning in the town mayor's concern about an influx of "undesirables" if the project were built. Similar meaning was seen in statements by residents at a public hearing on the question that the new occupants of the projects would "dilute" the public schools, that they were concerned about personal safety because of the influx of "new" people "just as

bad" who would move into the houses vacated by those moving into the new low-income housing. At 1066. Certainly as much racial meaning can be hidden in Woodruff's references to "them," and the "people" who "get something for nothing," a group he obviously juxtaposed with the "handicapped and elderly" for whom it is a "different story." Wiley's feeling that "crime was on the rampage" in the projects which would "degenerate to slum-like conditions" may also rest on a veiled reference to race. These comments must also be viewed in light of the County's recognition in its 1979 Comprehensive Plan that the majority of those needing improved housing, and thus of those who would live in Emporia Heights, were black.

Robinson, the tie-breaker, testified that his opposition to the project was based solely on its cost, rather than race, and the Court is convinced that race was not a consideration in his decision. With the aid of an accountant, he computed that the project would cost HUD $15,624,000 in rental subsidies over a 40-year period which, with interest at a rate of 10%, would total a $190,164,317 cost over that period. He further computed that the average monthly cost to HUD for each unit would amount to $5,353.[126] Robinson testified that he objected to the "several million dollars" of profit the developers told him they would earn off the project, and to the $412–$511 monthly rental for units in Emporia Heights, compared to $200–$250 rental per month for private apartments in the County. According to his testimony, Robinson was in favor of low-income housing, but felt that the Section 8 New program was a "rip-off" of the national taxpayer. Robinson himself was reared in a predominantly black community and had no electricity or plumbing in his home until he was 24 years of age. He also specifically maintained that race

120. BeLer Trial Test.

121. Ps.Ex. 22.

122. Ps.Ex. 21.

123. Ps.Ex. 22.

124. Ps.Ex. 21.

125. P.Inj.Tr. 120–129.

126. Ds.Ex. 13, Robinson Trial Test.

was not a factor in his vote,[127] and the Court so finds.

The last contemporaneous indicator of the rationale for the Board's veto lies in a July 17, 1981 letter from the County's Planning Director, David Whittington, to HUD to report the Board's disapproval of the Emporia Heights proposal.[128] Whittington related that the negative votes on the issue rested on concern that "the housing project would deteriorate to a slum-like condition," that "deteriorated public housing projects experience a very high crime rate," and "there are other methods available to provide decent housing rather than a public housing project." Also, said Whittington, the Board considered a petition by residents in the area of the Emporia Heights site who opposed the project. Whittington related that Robinson's opposition was grounded on the cost of the project and the "possible adverse impact to the adjoining neighborhood." At trial, Robinson denied that any concern for the neighborhood of the project colored his decision, and the Court finds that it did not. The record does not reveal the basis of the area residents' opposition to the proposal, and there is no evidence that this petition, or other public opinions provided the Board, were of the sort of obvious racial opposition present in *Smith v. Town of Clarkton, supra.*

The County attempts to dispel any suspicion surrounding the motives of those who voted against the Emporia Heights proposal by contending that the Board declined to pursue the Section 8 New program because of its cost, electing instead to participate in the Section 8 Existing and Moderate Rehabilitation programs by passing a resolution to that effect at its May 19, 1981 meeting.[129] In April, 1981, the County's Housing Committee met with Tom Crawford of the VHDA to discuss the Section 8 programs.[130] Barbara Holloway, Assistant to the County Administrator and County Housing Coordinator, prepared a report on the Section 8 Existing and the Moderate Rehabilitation programs for the benefit of the Board.[131] This report, dated May 11, 1981 and sent out to the Board members before their May 19 meeting,[132] described the workings of the Existing and Moderate Rehabilitation programs. It cited as benefits of the programs the provision of decent housing at affordable prices and the guarantee of fair market rental rates to owners. Holloway also urged that "communities will benefit from the program since, instead of new construction, which would bring with it an impact on governmental services and expenditures of tax dollars, a portion of the housing needs of lower-income families can be met by using existing units."[133] In a May 13, 1981 memorandum to the Board, County Administrator BeLer recommended to the Board for its May 19 meeting, at which it was to vote on Emporia Heights, that it consider the Section 8 Existing and Moderate Rehabilitation programs described by Holloway "as an alternative means of improving the housing stock in Greensville County, given the previous policy statement against housing *projects.* "[134] BeLer listed as benefits, of the plans Holloway described, that participation would primarily be by home owners and landlords from within the County, the local governing body would set "priorities as to participation in the program," and the subsidies would improve the housing stock and would provide economic incentives to increase the amount of rental housing. A negative effect, said BeLer, was that rent levels could increase "pending an increase in rental stock."[135] Crawford

127. Robinson Trial Test.

128. Ps.Ex. 45.

129. Ds.Ex. 8.

130. Ds.Ex. 2.

131. Ds.Ex. 3.

132. P.Inj.Tr. 110 (Holloway Test.).

133. Ds.Ex. 3 at 2.

134. Ds.Ex. 4 (emphasis original).

135. *Id.*

was present at the May 19 Board meeting.[136]

The County has attempted to paint the Board's selection of Section 8 Existing and Moderate Rehabilitation and rejection of Section 8 New subsidies as a rational choice, primarily through the testimony of James F. Kelly, the VHDA Director of Housing Management, who oversees the Section 8 Existing and Moderate Rehabilitation programs in Virginia. Defendants elicited from Kelly testimony that Section 8 Existing rental subsidies, which are provided for tenants in units which satisfy certain quality standards, could begin to reach the tenant within 30 to 60 days of the program's inception, whereas new construction requires several years to complete.[137] The 30 to 60 day estimate, of course, assumes that there are rental units available which meet the minimum housing standards set out in HUD's regulations[138] and that subsidy funds are available. Kelly noted that the "trend" in HUD funding in recent years has been away from the former 70%–30% allocation of funds in favor of new construction to approximately an even split between the New and Existing and Moderate Rehabilitation programs.[139] He also related that the federal government provides an average $5,000 yearly subsidy for each unit of newly constructed housing but only $1,800 a year for a unit in the Section 8 Existing Program.[140] These contrasts between the programs, say the defendants, gave the Board substantial grounds to opt out of the Section 8 New program in favor of the Existing and Moderate Rehabilitation schemes.

The Court, for several reasons, is not convinced that these economic considerations erase the possibility that racial concerns motivated the votes of Supervisors Woodruff and Wiley. The Board's adoption of the Section 8 Existing and Moderate Rehabilitation programs was an empty promise, for those present at the May 19 meeting were informed that there were no funds then available for those programs and that none would be available for some time. On the other hand, they were told that authority was presently available for the Section 8 New program.[141] HUD had made no study to determine whether there were units in the County suitable for immediate entry into the Section 8 Existing program.[142] Nor had the County done so.[143] BeLer testified at trial that he knew of no units in the County ready for participation in the Existing program and complying with the minimum housing quality standards prescribed by HUD regulations.[144] Plaintiffs' expert witness, Yale Rabin, conducted a survey of the County to assess the practicality of Section 8 Existing and Moderate Rehabilitation programs in the area. He concluded that there were no multifamily units in the County that could be used for the Existing program. Further, the only area of the County for which these programs were arguably feasible was the Washington Park community. Rabin interviewed persons in 127 of the 182 occupied Washington Park units. Of these, 68 were owner-occupied and 59 occupied by tenants. Fifty-two of the 59, or 88.1%, of the renter-occupied units had no running water, and none of these units had a central heating

136. P.Inj.Tr. 112–13 (Holloway Test.).

137. P.Inj.Tr. 161–62 (Kelly Test.).

138. 24 C.F.R. § 882.109. See text at p. 4, *supra*.

139. P.Inj.Tr. 162 (Kelly Test.).

140. P.Inj.Tr. 163 (Kelly Test.).

141. P.Inj.Tr. 140 (Faison Test.); BeLer Trial Test. Faison remembered that Crawford told the Board that no Existing or Moderate Rehabilitation funds would be available for 18 months. BeLer related that Crawford predict-

ed the availability of funds at the beginning of the 1982 fiscal year in October, 1982. Kelly testified that VHDA "would have told ..." the County that funds would be available in September or October. P.Inj.Tr. 160. The Court concludes that the VHDA indicated that the new fiscal year could signal the availability of funds from HUD.

142. P.Inj.Tr. 164 (Kelly Test.).

143. BeLer Trial Test.

144. BeLer Trial Test.

system. Provision of water and sewage facilities in these homes would necessitate the construction of a central disposal system since the lots on which these units are located are too small to support a septic tank and drain field for each unit.[145]

Defendants have presented no evidence to contradict Rabin's conclusions, and the Court finds that there are virtually no rental units in the County available for immediate participation in the Existing program, and that the vast majority of rental units in the County would require moderate rehabilitation to make them comply with the housing quality standards prescribed by HUD. The likelihood that such rehabilitation would occur was very small indeed, for it depends upon an owner of a rental unit and a tenant coming forward to participate and the owner obtaining from a local lending institution the $1,000 to $15,000 necessary to improve the unit to satisfy the quality standards. HUD guarantees these loans, but they are made at the current market interest rate, which at the times relevant to this action hovered around 17 or 18 percent. Kelly conceded that such a high interest cost dulled the enthusiasm of owners for the program.[146] No one from the County had come forward before this suit began to inquire of the Housing Coordinator as to either the Existing or Moderate Rehabilitation programs.[147] The Court is not in hindsight condemning the Board's resolve to participate in the Existing and Moderate Rehabilitation programs as an incorrect or irrational one. It is true, however, that the defendants' cost-effectiveness explanation for the decision and attempt to remove any suspicion of a racial motive behind the votes of certain members of the Board are undermined by the Board's knowledge that there were no funds available for these programs, awareness of the minimum housing quality standards required to participate in the Existing program,[148] failure to conduct any inquiry to determine the suitability of units in the County for these programs, and the obvious reality that the success of the Moderate Rehabilitation program depended on the willingness and ability of owners of rental property to obtain improvement loans at market interest rates. Adoption of these programs under these circumstances may have been intended by some merely as a sugarcoating for rejection of the Section 8 New program. At any rate, the Court does not accept the defendants' contention that the adoption of the Existing and Moderate Rehabilitation course of action completely dispels any suspicion that race may have been a factor in the Board's deliberations on the Emporia Heights project.

Another aspect of the history of the Board's action on the proposal support's the Court's view on this issue. Defendants' explanation of the Board's veto bears many of the characteristics of an after-the-fact rationalization for the Board's action. Defendants presented no contemporaneous documents or statements indicating that anyone but Robinson compared the costs of the various Section 8 programs. The Court is convinced, on the basis of Robinson's sincere trial testimony, that race played no role in his consideration of the Emporia Heights development. Even his decision, however, rested not on the comparative costs of the Section 8 programs, but on what he saw to be the staggering expense of the Section 8 New scheme. Furthermore, Robinson had no say in the adoption of the Existing and Moderate Rehabilitation programs, for the Board took that action at its May 19 meeting after reaching a tie vote on Emporia Heights. Defendants simply have provided no explanation of Woodruff's and Wiley's references to "crime," "slums," and the "people" who constantly receive "something for nothing," and the comparative costs argument sheds no light on what meaning the Court is to draw from those statements. Also, the Board voted to pursue the Existing and Moderate Rehabilitation plans at the May

**145.** Rabin Trial Test.

**146.** P.Inj.Tr. 168–69 (Kelly Test.).

**147.** P.Inj.Tr. 116–18 (Holloway Test.).

**148.** The Holloway report to the Board indicated the existence of these standards. Ds.Ex. 3.

19 meeting, after reaching a deadlock on Emporia Heights and scheduling a vote by the tie-breaker. The next day, BeLer wrote to Ritchie at VHDA to communicate the Board's intention to proceed with these programs.[149] All this occurred before the June 16 vote by the tie-breaker, and before the outcome of the Emporia Heights proposal was clear. This chronology of the Board's actions casts serious doubt on whether the Board's veto of Emporia Heights, particularly those votes of Woodruff and Wiley, rested solely on a concern over the relative costs of the programs and the burden they place on the American taxpayer, for electing to participate in Section 8 Existing and Moderate Rehabilitation before concluding the vote on Emporia Heights would have resulted in participation in all three programs if Robinson had voted in favor of the project. If cost were the sole concern, the logical course of action would have been for the Board to postpone consideration of Existing and Moderate Rehabilitation until after the fate of Emporia Heights was clear. Its failure to do so indicates that legally impermissible factors may have colored the negative votes on the project.

Thus, the Board's veto had a much greater adverse impact on the black residents of the County. The Board had a history of disapproval of low-income housing which is clouded with some racial overtones. The veto constituted a substantive departure from the County's recognized need for housing assistance programs and professed willingness to take some steps to remedy the substandard housing conditions within its borders and the administrative history of the decision both reveals certain veiled racial expressions by supervisors Woodruff and Wiley and undercuts the defendants' contention that their negative votes were based solely on the greater costs of a Section 8 New development over the Existing and Moderate Rehabilitation programs. On the other hand, there is nothing patent in the sequence of events which led up to the Board's veto or in its procedural history to spark suspicion of the Board's motives. Thus the "sensitive" inquiry into the purpose for the Board's veto becomes very sensitive indeed. The *Smith v. Town of Clarkton* court accepted the lower court's finding that a discriminatory intent underlay Clarkton's withdrawal from the joint housing cooperative formed with two neighboring towns and abandonment of the public housing project in Clarkton, on the grounds that Clarkton residents opposed the project for obviously racial reasons and voiced this to one of the town commissioners and at a public hearing, the citizens and the mayor had voiced concern over "undesirables" and their personal safety, which the court saw as camouflaged racial expressions; the county's black population felt the impact of the town's actions in a disproportionate manner, the town conducted the opinion poll for the first time in history, and the town commissioners took steps based on specious reasons to block efforts by a group of black citizens to arrange for a low income housing project after the town abandoned its own. In *Arlington Heights I*, the Supreme Court held that the plaintiffs had failed to prove that discriminatory purpose was a motivating factor in the Village's refusal to rezone a site to allow construction of a low-income project. There was little about the sequence of events leading up to the decision to arouse suspicion, said the Court, for the area had been zoned to preclude multi-family housing for the preceding 12 years and the site was surrounded by single-family homes. The Village had also for the previous nine years observed a policy which called for multi-family zoning to serve as a buffer between single-family development and commercial or manufacturing districts, and the site of the proposed project did not fit with this policy. The rezoning request was processed according to normal procedures. Also, the minutes of the meeting at which the request was considered revealed that the decisionmakers focused "almost exclusively on the zoning reports . . ." of the petition and relied on the Village's usual zoning considerations. 429

149. Ds.Ex. 9.

U.S. at 270, 97 S.Ct. at 566. Lastly, one of the members of the decisionmaking board testified at trial and provided no inference of invidious purpose.

■ The presence of a racial motive in the Board's deliberation in the instant action presents a difficult question. Largely on the basis of the obvious disproportionate impact of any denial of housing opportunity in Greensville County on the black residents of the County, the indirect racial references by two of the supervisors who opposed the project, the patent incongruity between the veto and the Board's prior recognition both of the need for housing assistance in the County, which need was concentrated in the County's black population, and the veto's inconsistency with the County's professed desire to take steps to serve housing needs and improve the housing conditions of its residents, the Court finds that race was a compelling consideration in the Board's deliberations on Emporia Heights and its veto rested at least in part on a racially discriminatory intent. Of course, there is lacking in this action a factor often present in such cases, for there is no evidence that white residents around the site of the project joined in racially-motivated opposition to its construction. While the nearest residential area to the site is predominantly white, there is, as the Court has observed, *supra*, a largely black area to the northwest within the City of Emporia. The absence of such concerted opposition may simply be the result of the site's location in an essentially rural area. Additionally, the references by Woodruff and Wiley to "slums," "crime on the rampage," and "those people getting something for nothing" could, in a different context, represent merely a distaste for low-income groups of any race or nationality. Nevertheless, in the context of this case, these statements can only be interpreted as racial expressions. This finding of racial intent is sufficient in itself to constitute a violation of the Fair Housing Act and rises as well to the level of a constitutional violation. Lastly, the suggestion of a racial intent is strong enough, even without the final conclusion that the Board's veto was in fact motivated in part by race, to provide much support for a conclusion that the plaintiffs established a violation of the Fair Housing Act under the *Arlington Heights II* inquiry.

3. *The County's Interest in Vetoing the Project* : [150]

■ Defendants maintain that the Board vetoed the Emporia Heights project out of a legitimate concern over the expense of a Section 8 New development to the federal government and the comparatively lower cost of the Existing and Moderate Rehabilitation plans. The Court has determined that this argument is largely an after-the-fact rationalization and is largely pretextual. *See Smith v. Town of Clarkton, supra*, At 1065.

The *Arlington Heights II* court indicated that it would be less willing to find a violation of the Fair Housing Act where the defendant is a governmental body "acting within the ambit of legitimately derived authority . . . ." 558 F.2d at 1293. Here the Board acted within the authority granted it by the veto statute, the Court is, however, of the view that even if a concern over the cost of a Section 8 New development to the federal taxpayer were the basis for the veto, such concern would not be the sort of interest which would tend to legitimate the Board's action under the Fair Housing Act. It is not the type of local interest, based on considerations of local need, housing conditions, zoning regulations, or growth plans which one could expect to be within the province of the local decisionmaking body. Rather, it is a national concern which flies in the face of the national policy dictated by the Congress in

150. As noted, the finding of racial intent is alone sufficient to support a conclusion that the veto is invalid under the Fair Housing Act. Also, the Court is of the opinion that the evidence of intent is of sufficient strength, even without concluding that race was a motivating factor in the veto, to tip the balance in favor of the plaintiffs under the *Arlington Heights II* analysis. Nonetheless, in the interest of judicial finality, the Court will proceed to consider the two remaining *Arlington Heights II* factors.

the Fair Housing Act. Defendants will not be permitted to justify their decision under the Act by fiscal considerations which contradict the Congressional decision that the nation is prepared to bear the costs of these programs.

4. *Relief Sought by the Plaintiffs:*

Although the plaintiffs request the Court to order that funding be made available for the Emporia Heights project, they apparently do not seek this funding directly from the County. As to the County, plaintiffs seek a declaration that the veto is invalid and enjoining the County from discriminating in its housing decisions and from interfering with efforts by private developers to proceed with the Emporia Heights project. This factor too favors the plaintiff.

■ Accordingly, the Court concludes that an analysis of the *Arlington Heights II* critical factors reveals that the Board's veto of the Emporia Heights proposal amounted to a violation of § 804 of the Fair Housing Act, 42 U.S.C. § 3604, and in turn § 817 of that Act, 42 U.S.C. § 3617, even without the conclusion that race was indeed a motivating factor behind the Board's decision.

### B. *420 U.S.C. § 1981, § 1982, and the Thirteenth Amendment*

■ The Court's finding that the Board's veto was motivated at least in part by a racially discriminatory purpose leads to the conclusion that the veto constituted a violation of 42 U.S.C. § 1981, which provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts ..." as is enjoyed by white citizens ...." *See Wright v. Salisbury Club, Ltd.*, 632 F.2d 309 (4th Cir. 1980); *Des Vergnes v. Seekonk Water District*, 601 F.2d 9 (1st Cir. 1979); *Resident Advisory Board v. Rizzo*, *supra.* Such a discriminatory purpose must be shown to establish a breach of this statute. *General Building Contractors Association, Inc. v. Pennsylvania*, —— U.S. ——, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982). The finding also results in the conclusion that the veto violated § 1982, which provides that "[a]ll citizens ... shall have the same

right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." *See Phiffer v. Proud Parrot Motor Hotel, Inc.*, 648 F.2d 548 (9th Cir. 1980); *Wright v. Salisbury Club, Ltd., supra; Williams v. Matthews Company*, 499 F.2d 819 (8th Cir.), *cert. denied*, 419 U.S. 1021, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). It is unnecessary for the purposes of this opinion to determine whether liability under § 1982 may rest on proof of discriminatory impact alone. *See General Building Contractors Association, Inc. v. Pennsylvania, supra*, wherein the (Court leaves the impression that § 1981 and § 1982 are to be construed in a similar fashion). Also, the Board's discriminatory intent violated the thirteenth amendment, to the extent that amendment "accomplished anything more than the abolition of slavery." *General Building Contractors Association, Inc. v. Pennsylvania, supra*, —— U.S. at —— n.17, 102 S.Ct. at 3149 n. 17.

### C. *Fourteenth Amendment: Equal Protection*

■ The Court's finding that the Board's disapproval of Emporia Heights was based in part on a discriminatory racial intent reveals that the Board's decision rested on a suspect racial classification which faces strict scrutiny under the fourteenth amendment's equal protection clause. Defendants have failed to demonstrate any compelling interest served by the racial distinction and have not shown that a veto would have resulted from the Board's deliberations even if the impermissible purpose had not been considered. *See Arlington Heights I, supra*, 429 U.S. at 270–71 n.21, 97 S.Ct. at 566 n.21. Thus, the veto rose to the level of a constitutional violation.

### D. *Fourteenth Amendment: Due Process*

Throughout this litigation, plaintiffs have pursued only half-heartedly their procedural due process claim that the developers of the Emporia Heights project were provided inadequate notice and opportunity to be

heard by the Board when it considered the proposal. No evidence or argument has been presented regarding the specific procedural flaws of which plaintiffs complain or the procedures to which plaintiffs would be entitled. Accordingly, the Court concludes that plaintiffs have abandoned this claim. At any rate, the Court perceives no violation of due process on the face of this case, for S&M were provided full notice of the Board's activities and an opportunity to present evidence in support of their proposal.

Plaintiff's substantive due process claim is that "the veto statute and the challenged decision made under it by [the Board] offend due process principles because of the lack of definite and reasonable standards." [151] Plaintiffs have failed to convince the Court that this doctrine, which has been applied to agencies or administrators in control of governmental benefits programs, *White v. Roughton*, 530 F.2d 750 (7th Cir. 1976) (administration of town's general assistance welfare program), and *Holmes v. New York City Housing Authority*, 398 F.2d 262 (2nd Cir. 1968) (determination of applicants' eligibility for admission as tenants to city's low-rent public housing projects), to a county board of registrars review of applications to register to vote, *United States v. Atkins*, 323 F.2d 733 (5th Cir. 1963), and to an adjudicatory licensing process, *Hornsby v. Allen*, 326 F.2d 605 (5th Cir. 1964) (review of applications for licenses to operate retail liquor stores), similarly applies to a statute which allows a local legislative body to pass on state funding of a low-income housing project within its borders, or to the body's decision under that statute. Plaintiffs have failed to show that this review process bears any of the earmarks of an adjudicatory decision. Nor is there anything to suggest that the governing body's decision will be immune from judicial review or that a court will be unable to detect and correct arbitrary actions by that body.

III. *State-wide Application of the Veto Statute*

Plaintiffs appear to claim that the Veto Statute inevitably results in decisions which would be a "discriminatory housing practice ..." under the Fair Housing Act and thus is "to that extent invalid" pursuant to 42 U.S.C. § 3615 and the supremacy clause of the Constitution. There is no assurance, however, that every conceivable application of the statute by any locality in the state will produce the sort of discriminatory impact condemned by the *Arlington Heights II* factors as a violation of the Act, and the Court grants this argument no further attention. Plaintiffs also cite to the Court the various past instances in which the statute has been applied by a local governing body and claim that there was present in each of them a disproportionate impact invalid under the Fair Housing Act and, in addition, contend that certain of these decisions were motivated by racial considerations. The Court deems it necessary to review these instances in the deposition of this claim.

A. *Halifax County*

On June 1, 1981, the Halifax County Board of Supervisors vetoed a proposed 60-unit Section 8 New project known as the Briargate, planned on a site on the north side of Route 58, just west of the City of South Boston, in the Black Walnut District of the county. The project was never constructed.[152] This decision had only a slightly greater adverse impact on the black residents of Halifax County. Of the families in the county below the poverty level, 60.2% are black, 52.8% of the units in the county without piped water are black-occupied, and 65.5% of the overcrowded units are occupied by blacks. Thus, substantial portions of those in the county who were adversely affected by the veto were white.[153] Though the project was planned for a predominant-

---

151. Plaintiffs' Supplemental Trial Memorandum at 13 ("Ps.Supp. Trial Mem.").

152. Ps.Exs. 6–1, 6–2, 6–3.

153. Ps.Ex. 2–1.

ly white area,[154] plaintiffs failed to indicate whether other sites in the area were available for development or that the veto would necessarily perpetuate the existing segregated housing pattern of the county.

There is little evidence of a racial motive behind that veto. Although plaintiffs presented evidence that the county's existing assisted housing projects are located in predominantly black areas and are overwhelmingly black-occupied,[155] the Court finds that the record does not reveal any series of actions by county officials to segregate these projects or otherwise taken for invidious purposes. In fact, the county's policy was to "[avoid] undue concentrations of assisted housing in areas containing a high proportion of low income persons." [156] Nothing in the sequence of events leading up to the board's decision arouses suspicion, except statements by several residents at the board's hearing on the project referring to "the kind of people" who reside in housing projects.[157] There were no procedural irregularities in the board's consideration of the proposal. Rejection of the development did substantively deviate from the multifamily zoning for the area,[158] and from the county's amended HAP for 1979–80 which emphasized locating new low-income housing in the Black Walnut Magisterial District.[159] The Court has no information on the administrative history of the veto or other insights into the contemporaneous thoughts of the board members or their reasons for the veto, other than the recollection of a county resident that one board member at the public hearing stated that "old white widows were afraid" of the project.[160] Without more evidence of the context within which that statement was made, the Court is unable to attribute to it much significance. In sum, the plaintiffs have failed to establish that the board's veto was prompted to any extent by a racially discriminatory motive, and the evidence of such an intent is very slight. The board was, of course, a duly constituted governing body and there is no indication that its interest in vetoing the project was illegitimate.[161]

Thus, the Court holds that plaintiffs have failed to demonstrate that Halifax County's veto of the Briargate project constituted a violation of the Fair Housing Act under the *Arlington Heights II* factors, or of the fourteenth amendment under *Arlington Heights I*.[162]

### B. City of Hopewell

On September 26, 1978, the Hopewell City Council voted to disapprove of a proposed 150-unit rental assisted family housing project known as The Bluffs.[163] The group disadvantaged by this decision was not predominantly black, for while 65.7% of the units in the city without piped water are black-occupied, only 28.1% of city families below the poverty level are black and only 30.3% of the overcrowded units are occupied by blacks.[164] Although the project

**154.** Trial Testimony of Barbara Ross, a black resident of Halifax County. ("Ross Trial Test.").

**155.** Ross Trial Test.

**156.** Ps.Ex. 6–7.

**157.** Trial Testimony of Cora Tucker, a resident of Halifax County. ("Tucker Trial Test.").

**158.** Ps.Ex. 6–6.

**159.** Ps.Ex. 6–7.

**160.** Tucker Trial Test.

**161.** Plaintiffs have not clearly specified the relief they seek on their claims that these applications of the Veto Statute were unlawful, beyond their request that the Veto Statute be declared invalid. The Court is of the view that the relief factor of the *Arlington Heights II* analysis is of little importance to the review of the prior applications of the statute.

**162.** The same holds for plaintiffs' § 1981, § 1982 and thirteenth amendment claims.

**163.** Ps.Exs. 8–1, 8–10.

**164.** Ps.Ex. 2–1. Regarding these other localities which have exercised their veto power, plaintiffs press upon the Court a comparison between the percentage of the locality's black families who live in overcrowded units, or lack piped water, or who are below the poverty level, with the percentage of white families who exhibit these indicators of housing need. Rabin prepared ratios to illustrate these com-

was to be located in a census tract which is 100% white,[165] plaintiffs failed to establish that adjacent residential areas were predominantly white or that the veto had the effect of perpetuating segregated housing in the city.

There is no strong evidence of a racially discriminatory intent behind the Board's vote. Though the city's assisted housing projects were racially segregated,[166] the city has since been chastised by HUD as sluggish in its efforts to improve minority housing conditions,[167] the proposal was consistent with Hopewell's HAP and land use plans and approval was recommended by the City Planner,[168] there was nothing in the sequence of events leading up to the vote to arouse suspicion and there were no procedural irregularities in the city council's consideration of the matter. Moreover, minutes of the council's meeting reflect that one councilman grounded his opposition to the project on the cost to the city in additional police and fire protection and schooling, and the inadequacy of streets in the area to accommodate the project's population. The council rejected the proposal "due to reasons expressed by . . . citizens" at the meeting, who spoke in terms of cost, sewage problems, and added traffic.[169]

Lastly, the record reveals that the council was a governmental agency pursuing local concerns over traffic, sewage and costs when it vetoed the project. Plaintiffs thus have failed to establish any statutory or constitutional violation resulting from the veto.

C. *Roanoke City*

In 1978, the City of Roanoke took various steps which delayed construction of a proposed 128-unit Section 8 New rental housing project, known as Lee-Hy Manor. The racially discriminatory impact of these actions by the city was relatively weak. Of the overcrowded units in the city, 33.1% are black-occupied, and 36.6% of the families below the poverty level are black. Of the few units without piped water, none are black-occupied.[170] Though the project was planned for a census tract which is predominantly white, plaintiffs failed to show that the delay in the construction of the project served to perpetuate segregated housing in the area, for other sites are available and a 48-unit Lee-Hy Manor was built in 1980. Plaintiffs did not establish that any actions by the city caused the project to be scaled down to 48 units.

Nor have plaintiffs shown any series of actions by the city in the past which prompt

parisons for all but Culpeper City and Timberville. Ps.Ex. 2–1. In each locality, with the exception of Roanoke City, a greater percentage of the black families in the locality suffer from overcrowding or lack of piped water, or are below the poverty level, than the percentage of white families with those characteristics. The ratios between these percentages ranged from 1.3:1 to 46:1. It is true that the *Arlington Heights II* and *Smith v. Town of Clarkton* courts in examining the impact of the housing decision involved assessed whether the black or white population was more in need of new construction and which population had the highest percentage of presumptively eligible applicants in order to determine whether the decision had an adverse impact on a significantly greater percentage of the blacks than of the whites of the area. Both Courts also, however, looked to the impact of the decision on the locality's population as a whole by examining the racial breakdown of the families in the area below the poverty level and the relative proportions of all the substandard housing in the area occupied by blacks and whites. The

Court in *Arlington Heights II* ruled that if the "class disadvantaged by the [defendant's] action [is] not predominantly nonwhite. . . ." the discriminatory effect of the action is "relatively weak." 558 F.2d at 1291. Given that in every locality but Roanoke City a greater percentage of the entire black population than of the entire white population is in need of improved housing, the Court will continue to inquire whether the class harmed by the veto was predominantly black. If not, the discriminatory impact of the veto was "relatively weak."

165. Ps.Ex. 8–3.

166. Ps.Ex. 8–7.

167. Ps.Exs. 8–12, 8–13, 8–14, 8–15, 8–18.

168. Ps.Ex. 8–9.

169. Ps.Ex. 8–10.

170. Ps.Ex. 2–1.

suspicion of the city council's motivation in hampering the project's development. Though the sequence of events leading up to the city's initial veto of the project is a bit convoluted, there is nothing in the record to cast doubt on the council's reasons for its opposition. Roanoke's City Manager initially responded on June 12, 1978, to the VHDA notice of a proposed project by citing a 1977 Resolution by the city council placing priority for publicly assisted housing on "the provision of new housing for the elderly and physically handicapped and rehabilitation of existing housing." [171] Roanoke City Council affirmed the City Manager's position by an August 14, 1978 resolution.[172] After HUD wrote to the city manager on September 12, 1978 rejecting the city's disapproval of the project and demanding an explanation of the grounds therefore,[173] he responded that the project was inconsistent with the city's emphasis on housing for the elderly and handicapped and with the city's 1977–78 HAP which designated the subject census tract for new construction for the elderly.[174] By a September 13, 1978 letter, the City Manager requested that VHDA treat its former correspondence as disapproval of the project.[175] VHDA refused to do so and continued to process the application.[176] Roanoke then filed an action in state court seeking to enjoin VHDA from financing Lee-Hy Manor and contending that the city had validly disapproved of the project because of the inconsistency with the city's HAP and its policies favoring housing for the elderly and handicapped and rehabilitation over new construction.[177] The city council again formally disapproved of the project on January 15, 1979, citing these inconsistencies as grounds for the decision.[178] The state court ruled that Roanoke had not yet validly dis-

approved of the proposal but gave it another opportunity to do so. Though the city again disapproved of the project in June of 1980, it eventually waived the 1977 Resolution to allow construction of a 48-unit Lee-Hy Manor. The Court perceives no abrupt procedural deviations on these facts to justify an inference that the city's opposition to the project was racially motivated. Throughout the history of its consideration of the proposal, Roanoke adhered to its policies favoring housing for the elderly and handicapped and rehabilitation over new construction. Nothing in the record indicates that these reasons, stated by the city to explain its decisions, were pretextual. Lastly, the city council was attempting to serve what it saw to be the area's need for certain types of housing and did not act outside the scope of its authority. No statutory or constitutional violation has been established on these facts.

### D. *City of Chesapeake*

On July 11, 1978, Chesapeake's City Council decided to disapprove of a proposed 122-unit Section 8 New Project known as Holly Cove.[179] The group harmed by this veto was not predominantly black, for though 81.5% of the units without piped water are occupied by blacks, only 52.3% of the families below the poverty level are black, and 56.1% of the overcrowded units in the city are black-occupied.[180] Though Holly Cove was to be constructed outside the major areas of minority concentration,[181] plaintiffs have not shown that the veto will necessarily perpetuate segregated housing in the city. Nothing in the historical background of the decision sparks suspicion, with the possible exception of the city's refusal to condone two Section 8 New

171. Ps.Ex. 11–4.

172. Ps.Ex. 11–6.

173. *Id.*

174. Ps.Ex. 11–7.

175. Ps.Ex. 11–8.

176. Ps.Ex. 11–10.

177. Ps.Ex. 11–12.

178. Ps.Ex. 11–13.

179. Ps.Exs. 3–1, 3–5.

180. Ps.Ex. 2–1.

181. Ps.Ex. 3–9 at Map D; Rabin Trial Test.

projects in 1977 citing "inadequate services and negative impact ..."[182] and the concentration of the city's publicly-assisted housing projects in minority areas. Plaintiffs failed to show, however, that the city had taken any such actions for invidious purposes. There were no peculiarities in the sequence of events leading up to the decision or in the process used to reach the decision. Disapproval of Holly Cove was on its face inconsistent with the city's land use plans and its stated "support [for] the development of subsidized housing for low-and-moderate income persons."[183] Plaintiffs failed to produce any evidence of the vote's administrative history, or that the city council was acting outside the scope of its authority. The Court, in the absence of evidence encompassing more detailed actions on the part of the city, cannot conclude that a statutory or constitutional violations resulted from the veto.

### E. Henrico County

On August 12, 1981, the Henrico County Board of Supervisors voted to veto Woodman West, a 196-unit federally subsidized family rental housing project proposed in 1978 by a Virginia developer for a site on Woodman Road in the Brookland District of the county.[184] The class disadvantaged by this decision was not predominantly black, since 22% of the overcrowded units in the county are black-occupied, blacks reside in 71.7% of the units without piped water, and 20.3% of the families below the poverty level are black.[185] Woodman West was to be located in a mostly white area,[186] but plaintiffs did not show that the veto will necessarily perpetuate the county's segregated housing patterns.

The historical background and sequence of events leading up to this veto do present

some reason to pause on the issue of the board's intent in disapproving of the project, yet not enough to lead to a conclusion that its vote was racially motivated. When the county declined to participate in the Section 8 Existing program with the VHDA in 1978, one supervisor remarked "[i]f you've got to have subsidized housing, damn it, put them all together ... I hate to see the government put just anybody next door to you."[187] On July 12, 1978, the board in response to local opposition to the project voted to downzone the Woodman West site from multi-family to single-family residential, an action which a state court later declared to be unlawful.[188] Otherwise there were no procedural departures in the board's decision. As nearly as the Court can determine, the proposal was consistent with the county's HAP and land use policies.[189] The only indication of the board's contemporaneous thinking on the veto was that it believed that the project was "inappropriate."[190] Nothing indicates that the board acted outside the scope of its authority regarding the veto itself. Though there are aspects of this decision, as in the matter involving Chesapeake, which raise some doubt as to the board's reasons for opposing the project, the Court is unable to conclude on the record that the veto amounted to a statutory or constitutional violation.

### F. Chesterfield County

The Chesterfield County Board of Supervisors voted in November, 1979 to disapprove of a proposed 182-unit project, known as The Woods, planned for a site on Strathmore Road in the northern part of the county.[191] The group harmed by this action was not predominantly black, for blacks reside in 27.8% of the overcrowded units in the county and 68.9% of those without piped

**182.** Ps.Ex. 3–13.

**183.** Ps.Exs. 3–10, 3–8 at 15.

**184.** Ps.Exs. 7–1, 7–6.

**185.** Ps.Ex. 2–1.

**186.** Trial Testimony of Robert Willis ("Willis Trial Test.").

**187.** Ps.Ex. 7–15.

**188.** Ps.Exs. 7–8, 7–11, 7–14, 7–15.

**189.** Ps.Exs. 7–9, 7–10.

**190.** Ps.Ex. 7–6.

**191.** Ps.Exs. 4–1, 4–2.

water. Also, 32.9% of those families below the poverty level are black.[192] Plaintiffs did not show that the veto of The Woods, which was to be located in a mostly white area,[193] will necessarily perpetuate segregated housing in the county. Nothing in the historical background or events leading up to the decision prompt suspicion of the board's motives. Nor were there any departures from standard procedure. The proposal was consistent with the county's land use policies, County Plan and HAP.[194] Nonetheless, plaintiffs failed to suggest anything in the administrative history of the vote to question the board's motives or to challenge the legitimacy of the interests the board was attempting to serve. Thus the Court finds no illegality in the decision.

## G. Roanoke County

The Roanoke County Board of Supervisors on March 11, 1980 elected to veto Crestview Apartments, a 126-unit project proposed in March, 1978 for a site on Route 24, east of the town of Vinton.[195] The group injured by this decision certainly was not primarily black, since blacks live in only 3.9% of the overcrowded units and 19.8% of those without piped water in the county. Moreover, only 7.1% of the county families below the poverty level are black.[196] Plaintiffs have not claimed that any racial intent colored the board's decision; nor have they presented any other evidence to enable the Court to assess the impact of the vote. Accordingly, they have failed to establish any impropriety in the decision.

## H. Pulaski County

The Pulaski County Board of Supervisors on May 22, 1979 cast its veto of a proposed 128-unit project known as Bob White

Apartments to be located on the north side of Route 611, just north of the City of Pulaski.[197] Any racially discriminatory impact of this decision was very weak. Blacks occupy only 6% of the overcrowded units and 7.6% of the units without piped water in the county, and comprise only 9.5% of the county families below the poverty level.[198] There is little or no evidence of a racial motive behind the vote.[199] The board grounded its disapproval on the project's "incompatibility with existing land use and future development goals of citizens of the area." [200] At a public hearing on the matter, local residents objected to the burden they felt the project would place on the county school system and fire department, the possible traffic problems, and the use of valuable farm land for the development. One resident did refer to the "increased crime, increased violence and decreased morals" which he felt result from such projects, but did so out of a dislike of herding people into a "10 acre asphalt jungle." [201] The Court thus finds no illegality in the board's veto.

## I. Town of Timberville; Town of Culpeper; Spotsylvania County

Plaintiffs have not claimed that any racial motive underlay vetoes of low-income housing projects by these localities, and have furnished so little evidence regarding their impact that the Court simply concludes that they have failed to demonstrate any impropriety in these decisions.[202]

## J. Loudoun County

On February 18, 1981, the Loudoun County Board of Supervisors voted to disapprove of Sterling Park, a 250-unit family rental

192. Ps.Ex. 2–1.

193. Willis Trial Test.

194. Ps.Exs. 4–1, 4–3, 4–6, 4–7, 4–8, 4–9.

195. Ps.Exs. 12–1, 12–4.

196. Ps.Ex. 2–1.

197. Ps.Exs. 10–1, 10–4.

198. Ps.Ex. 2–1.

199. See Ps.Exs. 10–12, 10–4, 10–11.

200. Ps.Ex. 10–4.

201. Ps.Ex. 10–12.

202. Ps.Exs. 14–1 through 14–7; 5–1 through 5–8; 13–1 through 13–8; Trial Testimony of Jerry Taylor and Bonny Burke.

project to be located in the City of Sterling Park in the eastern part of the county.[203] Blacks reside in 38.4% of the overcrowded units, and 37.3% of those without piped water in the county. They account for 25.1% of the families below the poverty level.[204] Plaintiffs failed to show that eliminating this project will necessarily perpetuate segregated housing in the county. The only real evidence of any racial intent behind the veto is that it departed from the county's recognized need for low-income housing and its stated willingness to provide it,[205] as well as testimony that at a public hearing on the matter 76 of 80 of those who spoke against the project were white, and some had referred to their desire not to "import problems." [206] The Court must conclude that plaintiffs failed to establish any statutory or constitutional invalidity in the veto.

## IV. *Veto Statute as Enacted*

 Plaintiffs contend that the state legislature was motivated by a racially discriminatory purpose when it enacted the Veto Statute in 1978, rendering the statute invalid under the equal protection clause of the fourteenth amendment and the supremacy clause of the Constitution. Plaintiffs' only evidence to support this assertion surrounds the efforts by Fairfax County to prevent construction of a 100-unit Section 8 New project proposed in October, 1977 for the county, known as Rolling Road Estates.[207] Relying evidence that Rolling Road Estates was to be located in a mostly white area,[208] that some county residents spoke in possibly racial terms against the project at a public hearing before the county's Redevelopment and Housing Authority

on the matter,[209] that other possibly racially-motivated opposition surfaced,[210] and that the project was consistent with the county's land use and housing plans,[211] plaintiffs contend that "Fairfax County's actions [to block the development] satisfy the *Arlington Heights I* criteria of racially discriminatory intent." [212] The Court fails to perceive any relevance in the Fairfax County Board of Supervisors' intentions in opposing the Rolling Road Estates project to the factors motivating the state legislature when it enacted the Veto Statute.

 The sole connection plaintiffs suggest between the Fairfax County experience and enactment of the statute lies in contemporaneous statements by certain state delegates from Springfield indicating their opposition to the project and the fact that five delegates from Fairfax County introduced in the House of Delegates the bill which became the Veto Statute. This alone does not enable the Court to conclude that race played any role in the General Assembly's deliberations on the Veto Statute. Indeed, the Court holds that it did not. Local review of proposed low-income housing projects was not a heretical notion, for under the A–95 review process and the § 213 procedure of the Housing and Community Development Act of 1974, 42 U.S.C. § 1439(a)(2), local governing bodies are asked to assess housing development proposals for their suitability and consistency with local land use and housing policy to
> accept, without review, the determinations of local governing bodies . . . as to the appropriateness of proposed development sites, the adequacy of streets and utilities to service the proposal site, and

---

**203.** Ps.Ex. 9–3; Trial Testimony of Richard Armstrong, one of the would-be developers of Sterling Park.

**204.** Ps.Ex. 2–1.

**205.** Ps.Exs. 9–4, 9–7, 9–9, 9–10.

**206.** Trial Testimony of Jerry Rugle.

**207.** Ps.Ex. 1–1.

**208.** Ps.Exs. 1–1, 1–2.

**209.** Ps.Ex. 1–24 at # 31 (one resident said she opposing "bring[ing] the ghetto to the suburbs." Of the 33 speakers at this hearing whose comments are summarized in Ps.Ex. 1–24, only this one suggests any possible racial animus.

**210.** Ps.Ex. 1–25.

**211.** Ps.Exs. 1–3, 1–7, 1–8.

**212.** Ps.Supp. Trial Mem. 29.

the proposed development's compliance with local building, zoning, housing and health codes and the locality's housing assistance plan, provided that such determinations are consistent with the underwriting and feasibility criteria of the [VHDA].[213]

VHDA's Executive Director, John Ritchie, who was closely involved in the bill's introduction and revision in the House of Delegates, stated that the statute essentially codified the VHDA's prior policy.[214] As originally introduced, the bill specifically required certification by the local governing body that the proposed housing development "complies with all local zoning and subdivision control ordinances," and required as well the approval of that body.[215] Concerned that the need for affirmative action by a locality would hamstring the VHDA in its financing efforts, Ritchie and the bill's sponsors revised it to its present version, requiring only that the locality not take negative action.[216] Adoption of the bill, says Ritchie, "turned upon the proper role for local participation in the process or local determination of what land use decision should be made in the locality."[217] The Court thus finds no merit in plaintiffs' contention that passage of the bill was prompted in part by a racially discriminatory purpose.

## V. VHDA and HUD Liability

■ Though plaintiffs sought, and the Court ordered, that VHDA and HUD be added to this action "for the sole purpose of assuring complete relief ...," plaintiffs have contended in their trial and post-trial filings that the "acquiescence" of these agencies in Greensville County's veto of the Emporia Heights proposal "violates their affirmative obligation under statutory and regulatory law."[218] Plaintiffs then cite the Court to the Housing and Community Development Act of 1974, 42 U.S.C. §§ 1437 et seq., Title VI of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000d et seq., and Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601 et seq., which are said to impose on HUD an affirmative duty override a locality's opposition to a proposed housing project and force it to accept it. Plaintiffs seek injunctive relief against VHDA and HUD "assuring financing for the developers and construction of Emporia Heights."[219]

The Court declines this opportunity to adopt plaintiff's expansive theory. Both HUD and VHDA conscientiously fulfilled their statutory duties in their processing of the Emporia Heights proposal. To date, it is not the veto but the reductions in HUD's Section 8 budget which has prevented construction of the project. The Court can perceive no ground on which to hold HUD or the VHDA at fault in the circumstances of this case.

## VI. Relief

In their complaint, plaintiffs sought a declaration of the invalidity of Greensville County's veto of the Emporia Heights proposal, an injunction prohibiting the County's Board of Supervisors from discriminating against low and moderate income citizens of the County on the basis of race, creed or color and from taking any action to prevent construction of low-income housing in the County, and compensatory and punitive damages. In a "Notice of Motion" filed on January 18, 1982, plaintiffs sought an injunction against VHDA and HUD directing them to take all actions necessary to ensure that Emporia Heights is constructed and that it receives a reservation of contract authority for 74 units. Alternatively, the plaintiffs ask for only the reservation, or only that the project be returned to the VHDA pipeline.

213. Ps.Ex. 15; Ritchie Dep. 15.

214. Ritchie Dep. 18.

215. Ps.Ex. 17.

216. Ritchie Dep. 18.

217. Id. at 20.

218. Ps.Supp. Trial Mem. 8.

219. Ps. Trial Mem. 11; Ps.Supp. Trial Mem. 12.

■■■■ As previously noted, the County's veto of the proposal did not directly cause its demise, for by such time HUD had allotted all its contract authority for the year to other projects. For this reason, the Court concludes that plaintiffs have not shown any entitlement to damages. Injury resulting from the lost opportunity to be considered for recaptured funds or for subsidies from the Secretary's Discretionary Fund is too speculative to serve as a basis for monetary relief. Though not part of their original claims, plaintiffs have argued that the low priority rating given Emporia Heights by the VHDA when it forwarded the project to HUD for approval was because of the County's stated policy opposing such housing, which in turn caused the project to lose funding. Thus, rather than challenging the veto as a single, isolated incidence of racial discrimination or of a housing decision violative of the Fair Housing Act, plaintiffs may have been better advised to focus more directly on a claim that the County's past actions amounted to a pattern or practice of discrimination or resistance to the full enjoyment of rights served by § 804 of the Fair Housing Act. To prevail on such a claim, plaintiffs would have to establish that the unlawful discrimination was a regular procedure followed by the County. *See United States v. City of Parma, Ohio, supra,* 494 F.Supp. 1095, and cases cited therein. Even if the Board's 1971 policy committed it to a pattern or practice of behavior violating these rules, the Court does not feel that plaintiffs established that the VHDA's ranking depended on this track record. Goshorn testified that the project was placed in a second priority group because the particular project "did not have any evidence of local support . . . ."[220] This refers primarily to support from the governing body. VHDA gave the project low priority not because of the County's prior disapproval of such developments, but because S & M had not come forward with any evidence of local support for this particular project. This case-by-case approach by VHDA refutes any contention that a locality's past opposition to other projects will cause VHDA to ignore future proposals for that area. The Court is further of the view that this action does not warrant imposition of punitive damages.

S & M and the class of minority plaintiffs from Greensville County are of course entitled to a declaration that the Board of Supervisors' May 19 and June 16, 1981 veto of the Emporia Heights proposal was violative of the Fair Housing Act and the fourteenth amendment. The claims of the state-wide class of minority plaintiffs for declaratory and injunctive relief must, however, be dismissed.

■■■■ There remains only the question of the injunctive relief to which S & M and the Greensville County class of minority plaintiffs are entitled. "Once a plaintiff has established the violation of a constitutional or statutory right in the civil rights area, a district court has broad and flexible equitable powers to fashion a remedy that will fully correct past wrongs." *Smith v. Town of Clarkton, supra,* at 1068. When the violation is of the Fair Housing Act, a trial court is to be guided by the Act's underlying purposes in fashioning relief. *Id.* at 1068. The Act was designed to encourage fair housing practices throughout the country, and to replace "the ghettos . . . by truly integrated and balanced living patterns." *Id., quoting United States v. City of Parma, Ohio,* 504 F.Supp. 913 (N.D. Ohio, 1980), *affirmed in part, reversed in part,* 661 F.2d 562 (6th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982). The *Town of Clarkton* court also noted that a locality cannot construct housing and then operate it in an illegally discriminatory manner. Nor can it discriminatorily interfere with a private organization's effort to construct low income housing. *Id.* Courts, however, are not to "intrude into the orderly functioning of local government any more than is necessary to remedy the specific ills brought on by the violation of a statutory or constitutional mandate or to fully achieve the goals

---

**220.** P.Inj.Tr. 200 (Goshorn Test.).

of [the Fair Housing Act and the fourteenth amendment]." *Id.* at 1069.

The district court in *Town of Clarkton* had ordered that the Town Board rescind its requested resignation of the members of its Housing Authority and its withdrawal from the joint housing cooperative formed with two neighboring towns. It further granted broad affirmative relief, ordering the town to "take whatever action is necessary to construct or cause the construction of 50 units of public housing in the Town of Clarkton," either by rejoining the housing cooperative and proceeding with the HUD process, or by constructing the units out of local funds. Lastly, the court enjoined town officials from taking any action to interfere with construction of the 50 units or applications by blacks for their occupancy. The appellate court approved of the directives that the town rescind its request for resignation of the members of its Authority and its withdrawal from the housing cooperative, that it rejoin the cooperative to proceed with the HUD process and that it refrain from interfering with construction of the 50 units of housing. It reversed, however, that portion of the order which would have required Clarkton to build the project using its own funds, ruling that "not every statutory or constitutional violation in the fair housing field which interferes with the ultimate completion of a housing project which appears to be headed for fruition requires an affirmative remedy of the scope imposed [by the district court]." *Id.* at 1069. Requiring the town to construct and maintain public housing units from its own resources went "one step too far." The Court continued: "That is not to say that such an order might not be proper in a different case, where for instance a project is abandoned for racial reasons after construction was substantially completed." *Id.* at 1069. The court accordingly modified the lower court's order to require the defendants to take all steps, "short of directly funding actual construction, necessary to facilitate the development of low-rent housing in Clarkton." *Id.* at 1070. Any further relief, said the court, would be an "unwarranted intrusion into Clarkton's local governmental function, disproportionate to the wrong committed." *Id.* at 1070.

The Court must attempt to fashion a remedy in this action which is proportionate to the wrong committed by the Greensville County defendants, and which will fully correct this past wrong. The scope of this remedy must be tailored to fit the nature of the violation and must be no broader than is necessary to remove the violation and its effect. *See United States v. City of Parma, Ohio, supra*, 661 F.2d at 576–77; *Resident Advisory Board of Rizzo, supra*, 564 F.2d at 145. Plaintiffs ask the Court to direct the County to assure financing of the Emporia Heights project. If this is a request that the County do so out of its own resources, this the Court declines to grant it. The Board's veto of the project was not the direct cause of its present lack of VHDA and HUD funding. Ordering the County to fund the project would far exceed the scope of the wrong the Board committed and would be much more than necessary to remove the effects of the Board's decision. That decision removed the Emporia Heights proposal from the VHDA "pipeline," rendering it ineligible to receive recaptured authority or to tap the Secretary's Discretionary Fund or authority reserved to VHDA by HUD in future fiscal years. The appropriate remedy then, is one which will remove these effects. The Board of Supervisors will thus be required to rescind its earlier veto of the Emporia Heights proposal, which will return the proposal to the VHDA pipeline, and to take no action to interfere with consideration of the proposal by VHDA or HUD in the normal course of their operations.

Plaintiffs would also have the Court direct the County to adopt a housing assistance plan, establish a fair housing educational program for all county officials and refrain from discriminating against persons in housing on the basis of their race, color, religion, sex or national origin. Again, such relief would go beyond that necessary to remedy the damage wrought by the unlawful veto. The County currently has fair housing goals, or professes to have them in its HAP and Comprehensive Plans. The

Court assumes that County officials will in good faith perform their duties in order to effectuate those goals. Should the Court prove to be overly optimistic in this assumption, plaintiffs may at any time return to the Court to demonstrate their need for more comprehensive relief or a mandatory housing program. At this point, however, compelling the defendants to develop a plan and an educational program to accompany it, as well as a broad order to refrain from discrimination in housing, will be an unwarranted intrusion into the County's local governmental function, disproportionate to the wrong committed.

Lastly, plaintiffs seek an order directing VHDA and HUD to arrange for financing and rental subsidies for Emporia Heights. The Court refuses to take such a drastic step, for it has found no wrong-doing on the part of these agencies and any such order would be a completely unwarranted intrusion in excess of any impact caused by their past conduct. The Court will go no further than to direct these agencies to return the Emporia Heights proposal to the VHDA pipeline of approvable projects to be considered in the usual fashion as if no veto had occurred.

An appropriate order will issue.